STATE OF FLORIDA *ex rel.* ALEXANDER J. AIRSTON, *Plaintiff in Error,* v. SIDNEY W. BOLLINGER AND ELIZABETH TUPPER BOLLINGER, *Defendants in Error.*

## Division A.

## Opinion Filed July 2, 1924.

1. Under the common law an agreement whereby the father seeks to transfer the custody of his minor child to another, is contrary to public policy and may be revoked by a parent, who may recover the custody of his child on writ of *habeas corpus.*

2. It is the general American rule that agreements by parents, for the transfer to others of the custody of their children are against public policy and are not binding on the parties.

3. An agreement by which the father surrenders the custody of his child, is not binding; he is at liberty to revoke his consent afterwards and obtain the child by writ of *habeas corpus.*

4. The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public

policy for the good of society, will not permit or allow the father to irrevocably divest himself of 'or to abandon them at his mere will or pleasure.

5. A parent will not be held to have surrendered the custody and control of his child permanently to a stranger, unless it clearly appears that such was his intention; and it will be presumed that the surrender of the custody of the child by his parent is intended to be temporary, unless the contrary clearly appears.

6. It is not sufficient that the person having temporary custody of the child understood that the parent had granted to him permanent custody; but it must be clear that there was a corresponding understanding on the part of the parent.

7. The statutes of Florida that permit a parent to part with his children by apprenticeship, adoption and guardianship, imply that it can be done in no other mode.

A Writ of Error to the Circuit Court for Palm Beach County, E. C. Davis, Judge.

Judgment reversed.

*Stapp & Vining,* and *M. S. Bobst,* for Plaintiff in Error;

*Farrington & Hall,* for Defendants in Error.

BROWNE, J.—Alexander J. Airston brought *habeas corpus* proceedings to secure the custody of his child Marguerite Louise Airston, who had been in the custody and care of its grandparents Sidney W. Bollinger and Elizabeth T. Bollinger, since the death of her mother when she was three weeks old.

The Circuit Judge denied the application and awarded the custody of the child to Sidney W. Bollinger and Elizabeth T. Bollinger.

The right of the grand parents to the custody of the child is based upon what the Court in its opinion said was "some sort of an agreement entered into whereby this child should remain with its grandparents."

Under the common law an agreement whereby the father seeks to transfer the custody of his minor child to another, is contrary to public policy and may be revoked by the parent, who may recover the custody of his child on writ of *habeas corpus.* Regina v. Smith, 16 Eng., L. & Eq. Rep. 221; Town of Torrington v. Town of Norwich, 21 Conn. 543; Johnson v. Terry, 34 Conn. 259. That doctrine seems to have the sanction of this Court. Hernandez v. Thomas, 50 Fla. 522, 39 South. Rep. 641, where it was said: "As to the alleged promise or agreement by Eugene C. Hernandez, the father, to transfer the custody of said children to their grand mother in the event he found himself unable to care for them as well as she had done, such agreements are against public policy, and are not, in cases circumstanced like the one under discussion, enforceable or binding upon the parties."

Shouler, in his work on Domestic Relations, says: "It is the general American rule that agreements by parents, for the transfer to others of the custody of their children are against public policy and are not binding on the parties." Vol. 1, Sec. 748 (6th ed.), citing Hernandez v. Thomas, *supra,* in support of the rule.

There seems to be some difference in the American authorities, as to the right of the father to recover custody of his child when he has entered into a contract to transfer its custody to another, but the better rule is thus stated by the Missouri Court: "It is also conceded that the father, by the common law, cannot irrevocably divest himself, even by contract with the mother, or by any other person, of the custody of his children. It is held, both in

England and in this country, that an agreement by which the father surrenders the custody of his child, is not binding; and that he is at liberty to revoke his consent afterwards and obtain the child by writ of *habeas corpus*. In some of the States, under special circumstances, it has been held otherwise, but such is the manifest current of authorities, in this country, as well as in England. * * * As to any mere article of property, either personal or real, the law permits a man to dispose of it, by gift or contract, as he chooses. Not so of his children. The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public policy for the good of society, will not permit or allow the father to irrevocably divest himself of or to abandon them at his mere will or pleasure. Such, generally, is the admitted law of the case.'' In the matter of Bernice S. Scarritt, 76 Mo. 565.

But even in those jurisdictions where such contracts are not regarded as against public policy, the rule is that "a parent will not be held to have surrendered the custody and control of his child permanently to a stranger, unless it clearly appears that such was his intention; and it will be presumed that the surrender of the custody of the child by his parent is intended to be temporary, unless the contrary clearly appears." 29 Cyc. 1593.

"It is not sufficient that the person having temporary custody of the child understood that the parent had granted to him permanent custody, but it must be clear that there was a corresponding understanding on the part of the parent. Miller v. Miller, 123 Iowa 165, 98 N. W. Rep. 631''; Jamison v. Gilbert, 38 Okla. 751, 135 Pac. Rep. 342.

In the case under consideration, Mr. Bollinger testified that, "We always understood that we were to have the child and raise it." But the record fails to disclose that there was any "corresponding understanding on the part of the parent."

In Iowa, where it is not the rule that such contracts are against public policy, the Supreme Court said: "It may be admitted, such a contract may be made, but certainly it should be clear, definite and certain." Drumb v. Keen, 47 Iowa 435. In that case after the death of the mother the father wrote a letter to the child's maternal grandmother just before the death of his wife in which he said: "A ———— is no better. She wants you to take Victor; thinks it best for you to have him; I think so too." This was the agreement under which the grandparents sought to retain the custody of the child, but the Court said: "This offer was accepted, and thereunder and thereby the child was delivered to the defendant. Conceding this offer and acceptance to have the force and effect of a contract, we are clearly of the opinion that it does not import that the plaintiff thereby deprived himself of the right to the care and custody of his child for any length of time."

In People ex rel. Barry v. Mercein, 3 Hill (N.Y.) 399, the Court said: "Our law recognizes no general authority in a father to dispose of his children except for some specific and temporary purpose; such as apprenticeship during the father's life, or guardianship after his death."

The Florida laws give to parents the right to part with the custody of children by apprenticeship, adoption, and guardianship. The existence of these statutes, and the several specific requirements essential to the validity of such abandonment, seems to indicate that by these methods only can a parent relieve himself of his obligation to support, educate, maintain and nurture his minor children, and his

correlative right to their custody. It was so held in Johnson v. Terry, 34 Conn. 259, where the Court said: "The statute (General Statutes, p. 309, Sec. 53), which provides a mode by which a parent may give away a child in adoption, implies that it can be legally done in no other mode."

In the case of Berenice S. Scarritt, *supra,* the father sought to recover the custody of his child between six and seven years of age from her maternal grandparents, whose claim to the right of its custody was based upon a letter written by the father to the grandmother in which, among other things, he said: "For the love I bear you as the mother of my precious, beloved wife; for the love I bear you for your own Christian virtues for the sake of the tender ties which I know bind you to Anne's and my baby, I am constrained to give the possession of her person unto you, until at least she passes her first decade in life. Oh! mamma, you can never know what a terrible struggle it has been for me to bring myself to this conclusion. It is only my great love for you, my solicitude for my darling's welfare and religious training, that has overridden my selfishness, and brought me to the knowledge of what is best for my child."

This is a much stronger showing than that made in the instant case, but the Court held that it did not establish a contract, and that there was nothing in the letter "which authorized a departure from the general rule, which gives the custody of the child to its father."

The testimony in this case, falls far short of what is required according to the rules laid down by the foregoing authorities.

It appears from the record, that the wife of the petitioner Alexander J. Airston, died in a hospital in Philadelphia when the child that is the subject of this proceeding, was about two weeks old.

Mrs. Bollinger and the petitioner were with Mrs. Airston when she died, and immediately thereafter, they walked out of the ward into the next ward where the little girl was lying in her crib, and Mrs. Bollinger said: "I must have the little girl" or words to that effect. Mr. Airston says that he "naturally acquiesced in that"; "that he considered that it was better for a two weeks old baby to be with the grandmother than with him at that time; such was the substance of any conversation that he had with Mrs. Bollinger, and at no time did he give her unlimited possession of the child, or give her possession, custody and control of it, with the understanding that they were to keep it.

Mrs. Bollinger, when asked how she came "to receive the possession of the child," replied, "Well, I suppose because it was the most natural place; I was the most natural mother for the baby to have." She says she received the custody of the child with the consent of the father. When asked if she could tell what the conversation at the hospital with Mr. Airston was, or its substance, she replied, "that I should take the baby." She said she could not give the exact conversation. She further testified that she heard Mr. Airston tell a Mrs. Eckert that he would not take the child away from her.

Mr. Bollinger testified that on one of the occasions when Mr. Airston went to see his child in their home, that they went out together to take a street car; that it was raining, and he held an umbrella over his son-in-law; that they talked of the child's future, and he told Mr. Airston he would raise the child and keep it as his own; "to which he assented and said it was fine; couldn't desire anything better; and only stipulated then that he would select the higher institution for her education, when she reached

the age of young womanhood, provided I intended to send her."

When asked, "Did he at that time give you the permanent control of this child, and possession? A,—Nothing mentioned about permanency, other than that."

At another point in his testimony, he was asked, "by his actions or conversation, did he ever at any other time lead you to believe that the child was to be permanently in your possession?" To which he replied, "No." He says that was the only time that he had any conversation with Mr. Airston about the child remaining with the grandparents. This lacks a great deal of being "clear, definite and certain" so as to divest the father of the right to the custody, companionship and love of his child, that are his, by nature's and human law alike.

Mr. Airston swears positively that he never gave "Mr. and Mrs. Bollinger possession or custody and control of that child, with the understanding that they were to keep it."

Mr. Airston testified in relation to the conversation with Mr. Bollinger about educating the child; that he mentioned that he would send the child to school, not to college, and that he was making inquiries at some school to which he knew her mother would have wished her to go, and he stipulated that he would send her to school, and that he intended to send her to school at an early age.

There is nothing in the conversations between these parties to indicate that they thought they were entering into a solemn and binding contract. There is no question but that the father and grandmother both rightly thought that a child two weeks old should be cared for by the grandmother. Two and a half years afterwards, however, the situation had materially changed. The father had married an estimable woman, a trained nurse, who was cap-

able of caring for his child, and willing and anxious to do so. His financial condition had improved, and while he did not possess the great wealth of the grandparents, a parent's love and nurture is more desirable for a child than great riches.

When the child was about two years old, Mr. Airston married a graduate trained nurse of several years standing. His financial circumstances had improved, and he was earning about $3,000.00 a year.

His wife testified that she was with the child "from the time she was a day old, for about ten days," and she "last saw her when she was three weeks old"; that she was competent to take care of the child and give it the best of care and attention, and that she was willing to undertake the duties that would devolve upon her as a mother to look after the child and care for it.

There is nothing unusual about the situation disclosed by the testimony. Left a widower with a ten days' old child, it was only natural that he should acquiesce in the suggestion of the child's grandmother that she take the child, and while he remained a widower, and the child was very young, it was natural that he should be willing for the grandparents to enjoy its companionship; but when his circumstances changed, his financial condition improved, and he married a woman peculiarly fitted to nurture a child, it was only answering the call of nature and the instinct of fatherhood, to desire the love and companionship of his child. So much did he love it and feel the need of its love, that in order to enjoy its companionship, and give it a father's love and affection, that he was willing to forego a share in the grandparents' fortune, which Mr. Bollinger estimates to be around two or three hundred thousand dollars.

This child is his; he wants it; he is well able to take

care of and provide for it, and he is unwilling to sell it for the prospect of its sharing in its grandparents' fortune.

There is no question involved as to the fitness or unfitness of any of the parties.

In Hernandez v. Thomas, 50 Fla. 522, 39 South. Rep. 641, this Court cited approvingly from Verser v. Ford, 37 Ark. 27, to this effect: "As against strangers, the father, however poor and humble, if of good moral character and able to support the child in his own style of life, cannot be deprived of the privilege by anyone whatever, however brilliant the advantage he may offer. It is not enough to consider the interest of the child alone. And as between father and mother, or other near relation of the child, where sympathies of the tenderest nature may be confidently relied on, the father is generally to be preferred."

No cause appearing for depriving this father of the right to the custody and control of his child, the judgment is reversed.

TAYLOR, C. J., AND ELLIS, J., concur.

WHITFIELD, P. J., AND WEST AND TERRELL, J. J., concur in this opinion.