Commonwealth ex rel. Ganster, Appellant, *v.* McGee et ux.

Argued April 22, 1931.

Before Trexler, P. J., Keller, Linn, Gawthrop, Cunningham, Baldrige and Drew, JJ.

*H. E. Marker,* and with him *Wm. S. Rial, John A. Walls, William G. Stewart* and *W. Galbraith Stewart, Jr.,* for appellant.

*H. H. Fisher,* and with him *Philip K. Shaner,* for appellees.

Opinion by Cunningham, J., July 8, 1931:

Appellant, the father of three minor children, now living with their maternal grandparents, instituted habeas corpus proceedings in the court below for the purpose of securing their custody. By this appeal we are asked to reverse the order of Dom, J., remanding

the children to the custody of the grandparents. Our duty in reviewing such proceedings is prescribed by the Act of July 11, 1917, P. L. 817, which directs that we "shall consider the testimony and make such order upon the merits of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong." The case therefore falls within that difficult class of cases which demands of us the most careful, and indeed anxious, consideration; we are not reviewing a money judgment or one affecting the property rights of the parties but dealing with a situation in which the natural emotions of a parent and grandparents are factors and the ultimate welfare of the children is involved. We may not content ourselves with merely ascertaining whether there was evidence supporting the conclusions of the court below; in addition to considering the circumstances as they now exist, we must contemplate, as far as humanly possible, the probabilities of the future.

The decision of the learned judge of the court below was arrived at after a most careful consideration of the testimony and with the advantage of having seen and heard the parties. We know his opinion expresses the results of a conscientious effort to interpret the testimony fairly and apply thereto established principles of law, but, upon performance of our statutory duty, we cannot escape the conclusion that he has attached undue importance to a so-called "agreement" (hereinafter referred to) between the parents and grandparents relative to the custody of the children and has failed to give sufficient weight to the legal presumption (Heinemann's Appeal, 96 Pa. 112) that it is for the best interests of children to be under the nurture and care of their father, as their natural protector, both for maintenance and education. It may also be that a natural sympathy

with the desire of the grandparents to have the children remain with them has outweighed, to some extent, the more important consideration of their permanent welfare. We gather from the record these historical facts: Joseph Ganster, the appellant, on June 20, 1916, married Mary Ida McGee, the daughter of James and Margaret F. McGee, of Mt. Pleasant, Westmoreland County, the respondents. They lived happily in a suburb of Pittsburgh, the father being employed as a mechanic at the Westinghouse and Carnegie Steel plants. Three children were born, John Francis, July 31, 1917, James Paul, June 9, 1922, and Mary Angela, February 10, 1926. The disruption of the family was occasioned by the death of the mother in a Pittsburgh hospital five days after the birth of Mary Angela. When her serious illness began in November, 1925, the oldest son, John Francis, went to the home of his grandparents. On the day following his mother's death, the second son, James Paul, was taken to their home, as was also the baby, Mary Angela, about six weeks later. The three children have remained in this family, consisting, in addition to the grandparents, of an unmarried son and daughter, and the evidence indicates that their care has fallen chiefly upon their aunt. There is no dispute about the fact that on the day of the wife's death she said to her mother in the presence of her husband, ''Frank and I have decided to let you have the children,'' and that her husband assented to this statement. About the time the baby was taken to the grandparents the father agreed to pay them $60. each month toward the maintenance of his children and to supply them with clothing. These payments were continued from February or March, 1926, until December, 1927, and during this period the father visited the children at least weekly. The relations between the father and the grandparents had become some-

what strained and considerable friction had arisen, due to the fact that he had indicated an intention to marry Mary A. Murphy, a registered nurse, then employed in Pittsburgh but whose parents lived in Mt. Pleasant. There is some conflict in the testimony at this point, but there can be no substantial doubt that the difficulties may be attributed chiefly to the impending second marriage of the father. He said: "Things became unpleasant for me to go there. I heard about it all the time and consequently I quit going. The children and I never had any trouble between us." The grandmother testified: "Q. The real trouble came up about his marrying Miss Murphy? A. I didn't like to see the children get a step-mother but I couldn't say anything against Miss Murphy. Q. But you did say something about Miss Murphy? A. Yes, but nothing against her character. Q. You remonstrated against her? A. Well yes, but I have nothing against Miss Murphy now."

As a result, the father's visits to his children became less frequent and were finally discontinued and he did not see them until December, 1929, when he made demand for their custody. From December, 1927, appellant neglected to make the monthly payments and is now indebted to the grandparents in a sum of more than $2,000. With respect to this matter he testified that he owed the grandparents money but had "made them an offer of a monthly and partial payment, which they refused at the time," and continued: "Q. In November or December, 1929, when they demanded the money, did they say you could have the children if you paid the money they demanded? A. Yes; when I paid the money I could have the children." This testimony was not specifically denied by the respondents, but we find nothing in the evidence which would justify an inference that their motive in refusing to surrender the children was primarily mercenary.

Appellant married Miss Murphy on September 5, 1929, and they are now living in Edgewood in a new six-room, brick and tile house, with modern conveniences and furnished throughout. The lot has been conveyed to appellant and his wife, who furnished part of the money for its purchase; the record does not show how much is owing on the property. Excellent school facilities are within half a mile of the home. The fitness of appellant and his wife to have the custody of his children is not questioned in any way; he is a steady worker and has an annual income of approximately $2,200. His reply to the question whether he planned for the children when building the house was, "I did. Before the house was built it was planned with that idea that there would be room enough for these three children, and that is the way it was built." His present wife testified that it is her desire "to be a mother" to the children. On the other hand, the home of the grandparents is also a proper place for the rearing of the children; the grandmother and other members of the family are entitled to unreserved commendation for the manner in which they assumed and have discharged the responsibility of their care and education. The grandfather and his son are engaged together in business and have an annual income of about $2,500. The court below says in its opinion that it was stated at the argument, and not denied, that the grandmother also has an independent income but there is no evidence on the record relative to this matter. Fortunately, there are no religious differences between appellant and respondents. We have, therefore, the case of a father, who, having been compelled by circumstances to surrender the custody of his children to their grandparents, has now established another home and is desirous of resuming their custody and discharging his obligation to maintain and educate

them; his attitude, as expressed by him, is, "They are my children and I have the place to take care of them and I want them with me."

It has been repeatedly held that the father's legal right to the custody, care and companionship of his children grows out of his obligation to maintain and educate them and is not to be interfered with except for the most substantial reasons affecting their welfare: Com. ex rel. v. Blatt, 165 Pa. 213; but it is also true (Com. ex rel. v. Faxstein, 84 Pa. Superior Ct. 243) that this right must be yielded if their welfare would be more secure elsewhere. Manifestly, the question here involved is whether the presumption in favor of the father has been overthrown by the evidence. The strongest item against the operation of the presumption is his failure to continue the monthly payments. Neither the excuse that the respondents had rendered it unpleasant for him to continue his visits, nor his statement that he was unable to keep up the payments while building his new home, justifies in any degree his failure to contribute to the maintenance of his children. His first duty was to them. The court below, after stating that "the custody of the children was given to the respondents by the relator and his wife without reservations, qualifications or conditions," construed his withdrawal of support as indicative "that at the inception of the custody of the children in the McGees he had relinquished all parental claims to them and had been relieved of all obligation to support them." In a case entitled In Re Custody of Betty and Marjorie Rosenthal, 103 Pa. Superior Ct. 27, we again stated that the relationship between parent and child is a status and not a property right and that contracts relative to a child's custody are not conclusive but must give way to the paramount consideration of its welfare.

As an alternative it was suggested that, if his withdrawal of support was not to be construed as a binding relinquishment, then it must be interpreted as an act of abandonment, persisted in for upwards of two years. We think, when the testimony is read and considered as a whole, this conclusion is not fully warranted. We do not condone the failure of appellant to make the payments but, as we stated in Com. ex rel. v. Brown, 100 Pa. Superior Ct. 353, if he is now able and willing to discharge his obligations as a father, his former dereliction should not be permitted to weigh too heavily against him. He is indebted to respondents for the amount he agreed to pay them, with interest, and can best show his appreciation of the affectionate care they have given his children by making prompt payment of this indebtedness. If we were to regard merely the present condition of affairs and the hardship which we realize will be entailed upon the grandmother and aunt in removing the children from their custody, we would probably be disposed to agree with the court below, but upon giving proper weight to the question of the permanent welfare of these children, having in mind the age of the respondents, the changes which may occur at any time in their family and all the circumstances appearing from this record, we have unanimously concluded that the presumption in favor of appellant has not been overcome by the evidence and that the order remanding the children to the custody of the respondents should be reversed. Precedents are of little, if any, assistance in cases of this kind. Each case must be disposed of upon its own facts, but Com. ex rel. v. Welsh, 96 Pa. Superior Ct. 426, and Com. ex rel. v. Brown, supra, are examples of similar cases. The court below, in concluding its opinion, earnestly and properly urged the parties to make some arrangement to share in the custody and

said, ''We shall retain this writ as a pending proceeding in order that if necessary we shall be able to make and enforce a decree for the purposes aforesaid.'' The decree itself, however, remanded the children unconditionally into the custody, control and care of respondents. It thus differs from those entered in Com. ex rel. v. Blatt, supra, relied upon by counsel for respondents as supporting their contention that the decree in this case is not such a final decree as entitled appellant to appeal therefrom. In the case cited the language retaining the writ as a pending proceeding was inserted in the decrees themselves. Technically, the writ had served its purpose when the children were produced in court in obedience thereto, but in every case of this kind the lower court has inherent power to change or modify its orders as conditions may from time to time warrant or demand. What seems to be for the best interests of the children today may not be so tomorrow. The respondents should have the right to visit the children at their father's home when they so desire and the children should be permitted to visit with respondents at convenient times and for reasonable periods. If the parties cannot arrive at a satisfactory arrangement the court below, upon the application of respondents, will have power to enter and enforce an appropriate order.

The decree of the court below remanding the children to the custody of the respondents is reversed and the record remitted with instructions to enter a decree transferring the custody, control and care of the children to their father.