Commonwealth ex rel. Children's Aid Society
*v.* Gard et ux., Appellants.

416

Argued November 18, 1947. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent.)

*Thomas E. Whitten*, with him *Jason Richardson*, for appellants.

*W. I. King* and *Edmund W. Arthur*, with them *Carl E. Glock*, for appellee.

OPINION BY FINE, J., March 8, 1948:

The Children's Aid Society of Allegheny County (hereinafter termed Society) filed its petition for a writ

of habeas corpus to secure custody of Betty Jean Tuttle, age 4, from W. Russell Gard and Helen Gard, appellants and foster parents, averring *inter alia* its appointment as guardian by the Orphans' Court of Allegheny County; an agreement between it and appellants providing for the return of the child to it upon request; that the Society has secured an adoptive home for its ward; and that the welfare of the ward would be best secured by allowance of the writ. An answer was filed demanding proof that the welfare of the child required a change of custody and environment. After hearing, the court below granted the prayer of the petition and awarded custody to the Society and entered a decree accordingly. This appeal was perfected the same day and a supersedeas granted forthwith. After careful review of the record we conclude that the application of well-settled principles requires that the order be reversed and the writ be dismissed.

Betty Jean Tuttle was born out of wedlock on January 19, 1944, and the mother, unable to care for the infant, placed her in the Roselia Foundling Asylum. In May of 1945, the mother was required to remove the child from the Roselia Foundling Asylum, and thereupon she sought the assistance of the Society to arrange for foster care for her child. On May 23, 1945, appellants applied to the Society for a child for foster home care and had executed the agreement, set out in the margin.[1]

---

[1] The pertinent provisions read:

"1. We, W. Russell Gard and Helen R. Gard, do apply to Children's Aid Society of Allegheny County for a child or children for boarding home care in our home. We agree to accept any child so placed with us subject to the conditions laid down by the Society which we recognize has custody. We agree to hold any such child subject at all times to the call of the Society.

"2. We shall never assert any rights, custody or control adverse to that of the Society. It shall have the right to visit, to inspect and supervise measures taken by us to promote the child's well-being, and to call for the return of or to remove said child from our custody at any time in its sole discretion provided only that we shall have

On June 28, 1945, the child was taken directly to the appellants' home from the Roselia Foundling Asylum where she has remained ever since and is presently residing. In August of 1945, the mother advised the Society that she had an opportunity to marry and sought the Society's aid in arranging for adoption. Subsequently, she executed a release and granted authority to the Society to arrange for adoption.

Approximately 10 months thereafter, on June 25, 1946, the Society advised the appellants, without setting forth any reasons therefor, that the Society desired the return of Betty Jean Tuttle but appellants refused to return her. On June 28, 1946, the mother filed her petition in the Orphans' Court of Allegheny County suggesting that the court appoint the Society as guardian of the person of Betty Jean Tuttle. On the same date, without notice to appellants and proceeding *ex parte,* the Orphans' Court appointed the Society as guardian. On July 2, 1946, the Society, acting pursuant to its appointment, filed its petition for custody with the Orphans' Court. After answer and hearing, the Orphans' Court, on July 29, 1946, entered an order, affirmed by the court *en banc,* directing the appellants to deliver the possession of the child to the Society. The Gards appealed to the Supreme Court and that Court on April 14, 1947, in an opinion by Mr. Chief Justice MAXEY, concluded that the Orphans' Court lacked jurisdiction ". . . to decide the question of the custody of the child" and that ". . . the party seeking possession must proceed by writ of habeas corpus." *Gard Appeal,* 356 Pa. 378, 52 A. 2d 313.

been fully paid for board, clothing, medical care and such expenses as are on the Society's expense blank, accrued after the last preceding monthly settlement. . . .

"4. We understand that any child entrusted to us is not for placement and adoption, and we covenant not to do any act or thing with a view toward adoption under pain of forfeiture of this contract and the immediate return of such child to the society."

As the outgrowth of that litigation, the Society filed on July 8, 1947, its petition for a writ of habeas corpus averring, *inter alia,* its appointment as guardian by the Orphans' Court of Allegheny County; that custody of the child was necessary ". . . in order to perform the duties of its appointment"; that appellants presently have custody by virtue of the agreement referred to but have, after demand, refused to surrender the child; that the Society pursuant to the wishes of the natural mother, has arranged for "a permanent placement and selected an appropriate adoptive home"; that "the immediate and permanent welfare of the infant requires that it should be in the custody of the (Society) and that it should be restored to the possession of the (Society) to be dealt with in accordance with relator's duty to the Court of its appointment." On July 23, 1947, the natural mother filed her joinder with the Society for the writ of habeas corpus averring "that I shall not consent to adoption of said child by respondents." Appellants filed an answer admitting the agreement and the receipt of $801.31 for maintenance and support of the child but that, after tender, the Society refused a return of this sum. Appellants further demanded full proof regarding the permanent placement selected by the Society. On July 30, 1947, a hearing was held on the petition and answer and on September 29, 1947, the court below entered the order now complained of holding that, ". . . it appearing that it is to the best interest and welfare of the minor child, it is hereby ordered that the custody of Betty Jean Tuttle shall be awarded to the . . . Children's Aid Society of Allegheny County, the minor's guardian of the person."

The case is a proceeding for the custody of a minor, not for her adoption, and in such circumstances the paramount consideration is that which will best serve the interests and welfare of the child, which includes her physical, intellectual, moral and spiritual well-being.

*Commonwealth ex rel. Crilley v. Laird,* 160 Pa. Superior Ct. 132, 134, 50 A. 2d 542; *Commonwealth ex rel. Kreiling v. Kreiling,* 156 Pa. Superior Ct. 526, 530, 40 A. 2d 704; *Commonwealth ex rel. Reese v. Mellors,* 152 Pa. Superior Ct. 596, 598, 33 A. 2d 516; *Commonwealth ex rel. Keenan v. Thomas,* 151 Pa. Superior Ct. 131, 134, 30 A. 2d 246.

Such questions are among the most difficult which a judge is called upon to determine. Often no decision is possible without wounding the sensibilities of those who, after they have developed a deep affection for the child over the period of years, are called upon to surrender the child: *Commonwealth ex rel. Reese v. Mellors,* 152 Pa. Superior Ct. 596, 33 A. 2d 516. The Act of 1917, P. L. 817, section 1, 12 PS §1874, affords us broad powers of review by providing that an appellate tribunal ". . . shall consider the testimony and make such order upon the merits of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong." Such a case demands, therefore, our most careful examination and the exercise of an enlightened judicial discretion in a matter of the most delicate nature, for prosaic rights in chattels or money judgments are not at stake but one wherein the natural and instinctive emotions of love and affection and the ultimate welfare and happiness of the minor are involved. The burden of proof in such proceedings rests with the relator to persuade the court, if it can, that the ultimate welfare and best interests of the minor will be best served by awarding custody to the relator, and this by a preponderance of the credible evidence. The Society contends, however, that where, as here, natural parents are not involved, a different rule obtains, i. e., a duly appointed guardian, standing in *loco parentis,* is entitled to custody in the absence of disqualifications,—it being presumed that the child's welfare would be best served in the guardian's custody;

that such guardian does not have the burden of proving its fitness but, on the contrary, this onus rests with respondent not only to show that the guardian is unfit, but that as between the parties involved, the respondents can best serve the interests and welfare of the minor by her remaining in her present environment. A guardian, standing *in loco parentis,* is ordinarily entitled to the custody of his ward and has such authority over the ward as is necessary to the proper execution of the guardian's duties, cf. 25 Am. Jur. §62, p. 41. The cardinal consideration overlooked by the Society, however, is that these rights of the guardian exist solely for the ward's benefit and thus are not absolute rights to be acceded to in all circumstances but are rights which may be regulated, controlled or denied by the court when necessary in the promotion of the best interests of the ward. The Commonwealth is the paramount guardian *(parens patriœ)* and will look to the interests of the minor and to the interests which the sovereign has in the proper care and training of children upon which it is to depend for its future existence. Cf. *Brown's Estate,* 166 Pa. 249, 30 A. 112. At any time during minority the court may make such order regarding custody of a minor child, as the circumstances demand, having always in view, considerations which will best promote the welfare of the infant.

The court below fell into error in the conclusiveness it attributed to the Orphans' Court's appointment of a guardian of the person when it said: "The decision is controlled mainly by the [Orphans'] Court's judgment as to the best interest of the child. But these questions will have been decided if the Orphans' Court has appointed a guardian of the person for the child. In such case, and in the absence of extraordinary circumstances, Common Pleas Court should dispose of the proceeding in a manner that will give effect to the judgment of the Orphans' Court. The extraordinary circumstances

which would warrant Common Pleas Court in passing on the merits of the custody issue must show that the child will suffer harm before proceedings in the Orphans' Court can bring relief. . . . On the view of the law which we have taken this case might, without further consideration of the evidence, be disposed of by ordering the respondents to surrender custody of the child to the petitioner. There are no extraordinary circumstances which require us to pass upon the merits of the case. . . ."

The Supreme Court, in *Gard Appeal,* supra, has concluded that the Orphans' Court has no jurisdiction "to decide the question of the custody of the child" and that the proper procedure was by way of a habeas corpus proceeding. The court below in light of the holding in *Gard Appeal,* supra, erred in relying on the proceedings in the Orphans' Court and dispensing with any proofs by the Society that a change of environment was for the best interests of the ward.

An examination of the evidence reveals that at the hearing on the petition for writ of habeas corpus, the Society informed the court below that it had ". . . arranged a permanent placement and selected an appropriate adoptive home pursuant to the wishes of the natural parent." The Society called one of its supervisors who testified that the Society had ". . . selected a proper adoption home for this child, a placement for this child which prospective home has been known and studied by the Society for at least two years." On cross-examination, this witness was asked regarding the location of said adoptive home, and the names of the proposed adopting parents. She refused to answer and when counsel for appellants asked the court below to require said witness to answer, the court refused to do so. No further evidence was presented by the Society as to the nature of the environment into which this child will be placed by the Society, and to this date this Court

has no such information. In oral argument before this Court counsel for the Society, when asked regarding the nature of the circumstances in which the Society de- sired this minor to be reared and cared for, said: "We decline to go into that. It is a secret of the Society." There are no secrets where the welfare of a child is con- cerned. For a court to award custody of a minor on a mere statement by the relator that appellants' home "is not a suitable permanent home for this child" and that they have a more desirable home without the court know- ing the pertinent factors supporting such conclusion would be to delegate the judicial function in such mat- ters to the relator. This should not be done, and if done, constitutes an abuse of judicial discretion in circum- stances where it should be most delicately exercised. The Society urges that such nondisclosure is of vital importance since ". . . confidence and secrecy are the keystones in successful adoptions," and necessary "to protect the natural mother, the child and the adoptive parents, and to avoid social stigma of the child." The Society is fearful that, lacking such secrecy, "the whole system of foster homes and adoption would be upset and the effective work of child welfare agencies be seri- ously impaired." We do not underestimate the social significance of these considerations but do not share the views of the Society, for, if secrecy in any given case is a prerequisite to achieving the most desirable results concerning a minor's welfare, such secrecy can be af- forded, without prejudice to the rights of any of the interested parties, upon a showing that the exigencies of the particular case require it.

What are the circumstances and environment in which the minor is presently situated? The court below found that "Mr. and Mrs. Gard have no children. They live in their home in a pleasant suburban neighborhood. A child in their home will enjoy a good physical environ- ment. The economic capacity of respondents is adequate

to meet the needs of a child. They are of good character; . . . The child's health was poor when she came to respondents. It has improved since then." Appellants also called several neighbors who testified that the relationship between the child and appellants was one of mutual affection; that the atmosphere pervading the Gard home was one of happiness. In view of these findings the error of the court below is clear.

Appellants concede execution of the boarding home agreement but contend it is *contra bonos mores* and invalid. The efficacy of this agreement need not be determined on the present state of the record. It is sufficient to state, however, that contracts as to the custody of children are voidable agreements (Cf. *Commonwealth ex rel. Ganster v. McGee,* 103 Pa. Superior Ct. 12, 157 A. 345) and are subject to being set aside by the courts in the best interests of the child. Cf. *In re Rosenthal,* 103 Pa. Superior Ct. 27, 157 A. 342; *Commonwealth ex rel. Manning v. Manning,* 89 Pa. Superior Ct. 301, 305; *Enders v. Enders,* 164 Pa. 266, 273, 30 A. 129; *Adoption of Sleep,* 6 Dist. 256; see also 2 Restatement, Contracts, sec. 583; 13 C.J. sec. 435, p. 490.

We do not supinely condone the breach of contract by the Gards; nor could we approve the Society's position that a rigid adherence to its rules is the matter of paramount importance in this action. The rules of this Society are not the guides in reaching a conclusion; we must be motivated by matters which are for the best interest and future welfare of Betty Jean Tuttle. And, the evidence before us so considered, we determine the child should remain where she now is—with the Gards.

Order reversed and the writ dismissed; the parties to pay their own costs.