## Commonwealth ex rel. Dykins v. Harry

*John G. Zapotok*, for relators.

*Joseph Olexy*, for respondents.

PINOLA, P. J., September 13, 1963.—Relators seek through these proceedings to obtain custody and possession of their minor child, Steven Leonard Dykins, who was given to respondents by the mother, Patricia Dykins.

The child was born September 7, 1962, and custody

was transferred to respondents on or about January 24, 1963.

Relators, husband and wife, were married on October 17, 1959, at Biloxi, Miss. He was born on December 30, 1940, and she on August 9, 1942. She reached her majority eight days after the hearing was had in this case. They presently reside at R. D. No. 2, Hunlock Creek, and respondents reside in Plymouth.

They have two other children: Denise, born January 23, 1960, and Dale Robert, born February 3, 1961. These two are presently living with the parents.

At the time of their marriage, the male relator was serving with the Air Force. After their marriage, they lived in Biloxi, Miss., from January 1959, to February 1960, and at Benton and Plymouth, Pa., from March 1960 to April 1961. They lived at Sioux Look-Out, Canada, from May 1961 until early in 1962, when she returned to the home of her parents at Hunlock Creek because of financial difficulties encountered by the parties. He remained at Sioux Look-Out until 1962, when he was transferred to Duluth, Minn. He was discharged from the service on November 30, 1962. He attended an electronic school in that city and looked for work until March 1963. Early in April 1963, he returned to the home of his parents in Nanticoke.

She resided at 30 West Main Street, Plymouth, with her two children. She worked as a waitress until pregnancy became noticeable the latter part of May. Due to difficulties in connection with her pregnancy, she entered a hospital on June 29, 1962. Her mother cared for Denise, and a friend, Thelma Arnold, cared for Dale. After two weeks in the hospital, she returned to her mother's home, where she was confined to bed. She again entered the hospital on September 4, 1962, and gave birth to Steven Leonard on September 7th. Discharged on September 14th, she returned to her mother's home.

Because she was nervous and upset, she could not eat and had physical problems. She went to West Chester with her baby to reside with her father, her mother having previously been divorced and remarried. She stayed there until December 1962, when she returned to Hunlock Creek to live in a trailer purchased with funds furnished in part by her father, mother and stepfather. She left the infant with her father in West Chester.

Sometime in December, Mrs. Harry called Mrs. Dykins at West Chester with reference to possession of Steven. An engagement made was broken. Mrs. Harry called again. When Mrs. Dykins returned to the trailer after Christmas, Mrs. Harry called on her four or five consecutive days, and finally convinced her to allow Steven to reside with them. On January 24th, Mrs. Harry drove Mrs. Dykins to West Chester, where they obtained possession of the baby. The Harrys have had the child ever since.

In May 1963, relators became reconciled and sought the return of Steven, but respondents have refused to transfer custody and possession of the child.

There is no doubt that Mrs. Dykins, young as she was, underwent considerable frustration as the result of the relations between her and her husband. They were financially embarrassed from the beginning. She claimed that he drank and gambled away his pay.

Reverend Herbert E. Anderson, of Plymouth, testified that Mrs. Dykins asked him to obtain a certificate of her husband's blood type, which he did, and that she complained of her husband's drinking and gambling and failure to provide food for his family.

Shortly after the birth of the child, he said she wanted to put it in an orphanage or out for adoption immediately. Knowing the Harrys, his parishioners, and that they sought a child for adoption, he called Mrs. Dykins at West Chester, and introduced Mrs. Harry

over the telephone and started the negotiations, which ended with the transfer of the child.

Mrs. Dykins insists that the custody was to be temporary, and that she was to have the child if the husband returned to her within a year. She did not agree to any adoption. On the other hand, Mrs. Harry insists that the transfer of custody was to be permanent and that they were to adopt the child. Richard Dykins, the husband, demands that the child be returned to their home.

Respondents make much of the fact that relators are poor, while they themselves are in good financial condition and better able to care for the child.

Mrs. Harry testified that she asked Mrs. Dykins to sign the adoption papers, but she refused to sign at the time, saying that she wanted to wait until the end of the year.

Several witnesses testified that they heard Mrs. Dykins say that the Harrys were going to adopt her child. One of them, Margaret Phillips, testified that she asked Patricia if the Harrys were going to adopt the child, and she replied, "Yes, if I can find the father".

Respondents also point out that Mrs. Dykins had farmed out another child to the Arnold family.

A detailed discussion of all the testimony will serve no purpose, because under the law, relators are clearly entitled to the return of their child.

The confused law in cases between parents and third persons has finally been clarified by Judge Woodside in Commonwealth ex rel. Martino v. Blough, 201 Pa. Superior Ct. 346. He said, page 349:

"It is true, as the court below said in citing Com. ex rel. McKee v. Reitz, 193 Pa. Superior Ct. 125, 163 A. 2d 908 (1960), that the right of a natural parent is not absolute and must yield to the best interests and welfare of the child. We have emphasized too frequently to

require citation that the guiding principle in deciding a custody case is the welfare of the child. We reaffirm that principle. However, without detracting from the virtue of the principle, we must warn that it is not without limitation in its application. If this principle were universally applied, any person who by religion, morals, education, love, understanding, and social and economic status was 'better' than the person who had custody of a child could obtain custody of that child by a habeas corpus proceeding, and the 'best' person could obtain custody of any of our children. Com. ex rel. Benson v. Wayne County Child Welfare Service, 198 Pa. Superior Ct. 329, 332, 131 A. 2d 850 (1962)".

This accords with the holdings of other courts. In Ex Parte Kailer, 123 Kan. 229, 255 Pac. 41, the court said:

"It is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a judicial question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves. . . . And no court should construe its intrusive jurisdiction as extending to cases where parents have done nothing offensive to law, morals, or good conduct, which would forfeit their paramount natural right of parenthood, which is to have the custody of their own children".

And in McDonald v. Watkins, 89 So. 306 (Ala. App.), the court quoted from Black v. Montgomery, 84 So. 308 (Ala. App.), as follows:

"Bearing in mind the oft-pronounced rule in cases of this character that the welfare of the child is the paramount consideration, yet we cannot be unmindful of another principle of law, and humane provision, to the effect that prima facie the right of the parent to the custody of the infant should not be interfered with unless ... the best interest of the child or children will be manifestly observed by so doing. In other words, the welfare of the child or children is the primary consideration, though not always controlling, in determining whether the custody and possession assailed shall be disturbed. Where the controversy is between the parent on the one side and parties bearing no relation by ties of blood or otherwise on the other, as here, the natural ties of affection and sympathy existing between parent and child, though of an inferior race, or lowly condition, must be considered and should not be ignored in determining what is the best interest of the child".

We have no doubt that respondents are good people and that they have been, and would continue to be, good foster parents, yet we are required to return the child to its parents.

1. In the first place, the general rule is that neither parent has the right to give the custody of minor children to a third party so as to deprive the other parent of such custody, unless the statute so provides: In Re Guardianship of Hight, 194 Okla. 214, 148 P. 2d 475.

Where the father of a minor child has not forfeited his right of custody in any manner provided by law, the mother of the child cannot, by an agreement to which the father is not a party, give the child to a third person.

In Coleman v. Way, 217 Ga. 366, 122 S. E. 2d 104, the court declared:

"It is a well-settled principle of law that the mere failure of a parent to provide support for a minor child, when in the possession or custody of another person,

and no support of the child is requested or needed, is not a failure to provide necessaries, or such abandonment as will amount to a relinquishment of the right of the parent to parental custody and control".

2. Secondly, since a minor may disavow any contract made during minority within a reasonable time after arriving at the age of maturity, she certainly can do the same with respect to a child, which is a matter of infinitely greater importance to her than mere property rights would be. The law should be more liberal and more humane with minors in dealing with their offspring than it is when dealing with contracts affecting property and property rights. Since a parent may not make a gift of his offspring in the sense that he might give away his property, it would seem that, in circumstances like those in this case, where the mother of a child has made an alleged gift of such child when she was under the age of majority, she should at least be given the same right of disaffirmance as she would have if she had made a sale of property. She became of age eight days after the date of the hearing. In pursuing these proceedings, she necessarily disavows the contract, if one existed.

3. An agreement for transfer of custody of a child must be in writing. The court declared in Ex Parte Kailer, supra:

"Touching the oral agreement between the litigant at the time the children were taken charge of by respondents, it hardly needs to be observed that babies are not property to be disposed of by parol contract".

In State v. Libbey, 44 N. H. 321, the court concluded, page 324:

"The principle to be gathered from these cases is, that the rights and duties of the father cannot be transferred permanently to another, except by deed; and this seems to be the well settled doctrine of the common law".

In Estridge v. Taylor, 310 Ky. 684, 221 S. W. 2d 644, the court declared that a surviving parent "having had this right [to care and custody] he certainly cannot surrender it unless by a contract in language clear and convincing. Under this evidence we think there was failure to show a contract".

And in Weir v. Marley, 12 S. W. 798 (Mo.) the court declared, page 801:

"No well-considered case will be found where the custody of a minor child was by habeas corpus taken from the father and given to another upon the sole ground that the legal right of the father had passed to and vested in such other person by parol contract".

In Hussey v. Whiting, 145 Ind. 580, 44 N. E. 639, the court said:

"The oral agreement, express or implied, that the appellee should have the custody of the child during her infancy, would not preclude the appellant from reclaiming her custody".

4. Even though it be conceded that a parent may relinquish his right to the custody of the child, he will not be held to have done so unless it *clearly appears* that such was his intention: State v. Bollinger, 88 Fla. 123, 101 So. 282. And it will be presumed that the surrender of the custody of a minor child by its parent is intended to be *temporary*, unless the contrary clearly appears. The parent may reclaim the child at any time when its welfare is not thereby interfered with: McDonald v. Watkins, 89 So. 306 (Ala. App.).

The court declared, in Adair v. Clure, 218 Iowa 482, 255 N. W. 658:

"It is the settled rule of law in this state that the surrender of the custody of a minor child by its parents is *presumed to be temporary*, unless the contrary is made to appear. . . . 'there can be no interference with the natural right of a parent except upon showing of gross misconduct, either willful or enforced, and in

character such as to threaten serious and permanent detriment to the rights and interests of the child. No consideration such as the advantage of wealth, or social status, or even of personal affection, can of itself be sufficient. If the parent is a proper and competent person, and has not waived or forfeited his right, custody must be awarded to him' ". (Italics supplied.)

Respondents contend that the father *abandoned* the child.

In Commonwealth ex rel. Lamberson v. Batyko, 157 Pa. Superior Ct. 389, 391, Judge Rhodes said:

" 'Abandonment may occur . . . by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims'. . . . Abandonment involves more than mere temporary absence or even temporary neglect of parental duty".

In Cook v. Echols, 80 So. 680 (Ala. App.), where the wife became mentally deranged and the husband placed the child with strangers, the court declared:

"There is some conflict in the evidence as to whether this surrender of the child's custody by the father was intended to be *permanent*, but whether it was or not the law will not permit him to thus avoid the duty resting upon him to provide for its well-being. . . . No case has been called to our attention, and after diligent search we have not been able to find one, where the parents were denied the custody and care of their child on the sole ground that they were poor and were compelled to earn their bread by the sweat of their brow, or because some other person was more fortunately situated and better able to supply the necessities and comforts of life to such child. The history of this country is rich with traditions of humble homes that have produced men and women who have lived to honor their country and bless the generation in which they have lived; and, after careful consideration of the evidence in this case, we do not think that the difference in the

situation of the parties shown by the evidence justified the trial court in denying the prayer of the petition, and the judgment appealed from will be reversed, and one here rendered awarding the custody of the child to the petitioners". (Italics supplied.)

5. We must at all times consider the conditions in the family surrounding the alleged transfer of custody. The rule is that the right of a mother to the custody of her child is not lost beyond recall by an act of relinquishment, if such be the fact, performed under circumstances of temporary *distress or discouragement:* Barnes v. Morash, 156 Neb. 721, 57 N. W. 2d 783.

In State ex rel. Britton v. Bryant, 95 Neb. 129, 145 N. W. 266, the court quoted from another case to the effect that "The right of a parent to the custody of a child is not lost beyond recall by an act of relinquishment performed under circumstances of *temporary caprice or discouragement. . . .* The right of the parent *is not lightly to be set aside,* and it should not be done where unfitness is not affirmatively shown, or a forfeiture clearly established". (Italics supplied.)

In a case quite similar to ours, Giacopelli v. Florence Crittenton Home, 16 Ill. App. 2d 445, 148 N. E. 2d 487, the wife was in the menopause, and was emotionally disturbed by the pregnancy. She left St. Louis and went to Peoria, Ill., where the child was born. Her husband did not know of the birth of the child and, of course, did not consent to the transfer of its custody. The court held that a finding that the welfare of the child would best be served by denying custody of the child to the parents was insufficient to deprive natural parents of parental right to custody.

6. A *presumption* exists that the best interests and welfare of the child will be subserved by placing it in the custody of its natural parents or surviving parent: 67 C. J. S. 673, §87.

In Commonwealth ex rel. Ganster v. McGee, 103 Pa.

Superior Ct. 12, Judge Cunningham, referring to the action of the lower court, said at page 14:

"We know his opinion expresses the results of a conscientious effort to interpret the testimony fairly and apply thereto established principles of law, but, upon performance of our statutory duty, we cannot escape the conclusion that he has attached undue importance to a so-called 'agreement' . . . between the parents and grandparents relative to the custody of the children and has failed to give sufficient weight to the legal presumption (Heinemann's Appeal, 96 Pa. 112) that it is for the best interests of children to be under the nurture and care of their father, as their natural protector, both for maintenance and education".

7. Where a parent seeks to recover his minor child's custody from another, whose custody of the child was lawful in inception, the *burden* is on respondent seeking to retain custody to show that his continued custody best observes the child's welfare, not that the parent is unfit for custody thereof: Hustace v. Black, 191 S. W. 2d 82 (Tex. Civ. App.). This burden respondents have failed to discharge.

8. Ordinarily, children of the same family should not be separated. In Commonwealth ex rel. Reese v. Mellors, 152 Pa. Superior Ct. 596, Judge Hirt said:

"It is to the advantage of all children of the same parents that they be reared together in the family relationship; brothers should not be separated without good reason. Beaver's Appeal, 121 Pa. Superior Ct. 159".

From the testimony, we reach the following

FINDING OF FACT

The placement of her child by Patricia Dykins in the custody of Robert Harry and Jean Harry, respondents, was on a temporary basis.

And for the foregoing reasons, we reach the following

CONCLUSION OF LAW

Relators, Richard Dykins and Patricia Dykins, are entitled to the custody and possession of their child, Steven Leonard Dykins.

And so, we enter the following

ORDER

Now, September 13, 1963, it is ordered that Robert Harry and Jean Harry forthwith deliver to Richard Dykins and Patricia Dykins, their child, Steven Leonard Dykins.