927 So.2d 101 (2006)
A.F.L., JR., Father of B.P., A Child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 5D05-2372.
District Court of Appeal of Florida, Fifth District.
April 13, 2006.
*102 Ryan Thomas Truskoski, of Ryan Thomas Truskoski, P.A., Orlando, for Appellant.
Charles D. Peters, Orlando, for Appellee.
Barry W. Hepner, Orlando, Guardian Ad Litem.
PER CURIAM.
Appellant, A.F.L., Jr. ["A.F.L."], appeals an order denying his Acknowledgement of Paternity, Action to Establish Parental Rights, and Objection to Adoption Proceeding. We affirm.
This case began as a juvenile dependency action against E.P. ["mother"] and S.P. ["legal father"] concerning two children. However, only the parental rights to B.P. ["the child"] are at issue in this appeal.[1] At the time of the child's birth, the mother and legal father were married. The birth certificate for the child lists her mother and legal father as the child's parents. Mother testified that, "[t]he summer that I got pregnant with [the child], [legal father] and I had been separated for eight months. And he had just come back in August. And [A.F.L.] and I had been seeing each other for the summer that my husband was gone. So right up until the day that I decided to let my husband back, [A.F.L.] and I were together."
In August 2004, the Department of Children and Families ["DCF"] petitioned to terminate the parental rights of mother and legal father in anticipation of adoption by maternal grandmother. In the same month, A.F.L. learned he might be the child's biological father. Mother and legal father consented to termination, with their rights terminating on November 8, 2004. A.F.L. did not attempt to intervene in these proceedings until December 8, 2004, when he appeared at a judicial review hearing and claimed to be the child's father. Mother conceded that legal father was not the child's biological father and a paternity test was ordered. Prior to April 1, 2005, DCF requested a search of the Putative Father Registry and filed its certificate on April 12, 2005, that no one was registered. On April 4, 2005, DCF reported that the paternity test results showed that A.F.L. was the biological father. On April 18, 2005, the Putative Father Registry acknowledged receipt of A.F.L.'s claim of paternity.
On May 6, 2005, A.F.L. filed his motion in the action below, seeking to establish his parental rights and objecting to the pending adoption. The trial court denied A.F.L.'s claims on June 20, 2005. The lower court ruled, inter alia, that A.F.L. failed to register before DCF completed its search of the Putative Father Registry and that his tardy registration was ineffective to preserve his claim. We affirm.
The Putative Father Registry became effective on May 30, 2003. See Amendments to Florida Supreme Court Approved Family Law Forms, 870 So.2d 791, 792 (Fla.2004). The purpose behind the registry is set out under section 63.053. That section provides:
(1) In enacting the provisions contained in this chapter, the Legislature prescribes the conditions for determining whether an unmarried biological father's actions are sufficiently prompt and substantial so as to require protection of a constitutional right. If an unmarried biological father fails to take the actions *103 that are available to him to establish a relationship with his child, his parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the available legal steps to substantiate a parental interest.
(2) The Legislature finds that the interests of the state, the mother, the child, and the adoptive parents described in this chapter outweigh the interest of an unmarried biological father who does not take action in a timely manner to establish and demonstrate a relationship with his child in accordance with the requirements of this chapter. An unmarried biological father has the primary responsibility to protect his rights and is presumed to know that his child may be adopted without his consent unless he complies with the provisions of this chapter and demonstrates a prompt and full commitment to his parental responsibilities.

(emphasis added).
So far, the only Florida appellate case to mention the Putative Father Registry is J.S. v. S.A., 912 So.2d 650 (Fla. 4th DCA 2005). There, the appeal arose from termination of the parental rights of birth parents pending adoption of their minor child by the appellees. Mother, a 16-year-old, became pregnant and had a son. The mother claimed the biological father could be one of three men, including J.S. J.S. expressed an interest and wanted to know if the child was his.
A few months after her son was born, V.B. decided to give her son up for adoption and signed a waiver relinquishing her parental rights. Six months passed before J.S. finally acknowledged his paternity by registering with the Florida Putative Father Registry. Another two months passed before he filed an action to establish paternity and obtain custody. By this time, the boy was almost a year old and had been in the prospective adoptive couple's home for over eight months.
The trial judge found that J.S.'s "fight for his son `comes too late,'" explaining that J.S. failed to demonstrate "a prompt and full commitment to his parental responsibilities" by allowing nine months to elapse between the time the child was born and the time he asserted his claim of paternity. 912 So.2d at 660. In reaching its decision, the Fourth District looked to the legislative intent of Chapter 63:
Allowing a father to `sit on his right' or remain on the fence indefinitely would undermine the state's `compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of the children.' See § 63.022(1)(a).
912 So.2d at 661-62. The Fourth District concluded that there was clear and convincing evidence that the father failed to exercise reasonable diligence and firmness in establishing his paternity and that his actions fell short of showing a settled purpose to assume parental responsibilities for the child. The case before us presents an even more severe case of delay, equivocation and lack of acceptance of the responsibilities of parenthood.
The trial court also relied on Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In Lehr, the court noted that where an unwed father demonstrates full commitment to responsibilities of parenthood by coming forward to participate in rearing his child, his interest in personal contact with his child acquires substantial protection under the due process clause, but the mere existence of a biological link does not merit equivalent protection. 463 U.S. at 261, 103 S.Ct. 2985.
*104 Here, the evidence shows that A.F.L. never established a relationship with the child or financially supported her, even after he learned he was her biological father. A.F.L. learned in August 2004 that he might be the child's father, but he failed to act until nine months later, long after termination of mother and legal father's rights. The trial court did not err in concluding that A.F.L. did not timely demonstrate a settled commitment to the responsibilities of parenthood. A.F.L. also complains that the trial court failed to make a "best interests of the child" inquiry, but the record does not support him for reasons it would serve no purpose to detail here.
A.F.L. also suggests that, because DCF failed to search the registry before terminating parental rights, DCF is "estopped from going back in time in an effort to cure this defect." A.F.L.'s argument lacks merit. The focus of the statute is preservation of the father's rights, not DCF's. Either the father timely registered, in which case his rights are preserved, or he did not, in which case his rights are not preserved. If DCF had searched the registry, A.F.L.'s name would not have appeared.
A.F.L.'s additional argument that DCF had actual notice of his paternity also fails based on Lehr. In Lehr, the failure to give a putative father notice of pending adoption proceedings did not deny him due process even though the state had actual notice of his existence where the putative father failed to register. A.F.L. should have known the possibility existed that he was a father at the time mother was pregnant, and mother conceded that A.F.L. was most likely the father in August 2004. When DCF later learned of A.F.L.'s existence, it conducted a search of the Putative Father Registry, but A.F.L. still had not registered.[2] A.F.L. failed to do what was necessary to preserve any claim as a parent of the child.
AFFIRMED.
GRIFFIN, THOMPSON and MONACO, JJ., concur.
NOTES
[1] The maternal grandmother has had custody of the child since May 2002, when he was one year old. She also has had custody of the child's brother since 2003. She previously raised B.P.'s first child, who is now an adult. The maternal grandmother plans to adopt the child.
[2] A.F.L. also claims he is entitled to relief because of mother's "fraud" in failing to reveal her suspicion about the child's paternity. DCF correctly asserts that this argument has not been preserved for appeal and, in any event, lacks legal or factual merit.