944 So.2d 380 (2006)
In the Matter of the Termination of Parental Rights for the Proposed ADOPTION OF BABY A., a child.
A.S., father, Appellant,
v.
Gift of Life Adoptions, Inc., Appellee.
A.S., father, Appellant,
v.
Jane Doe, mother, Appellee.
Nos. 2D05-3614, 2D05-3615.
District Court of Appeal of Florida, Second District.
July 21, 2006.
Barry A. Cohen, Christopher P. Jayson, and Kevin J. Darken of Cohen, Jayson & Foster, Tampa, for Appellant.
*381 John R. Fricker, Pinellas Park, for Appellee Gift of Life Adoptions, Inc.
Arthur J. England, Jr., and Daniel M. Samson of Greenberg Traurig, P.A., Miami; and Anthony B. Marchese, Tampa, for Appellee/Participants, Prospective Adoptive Parents.
Dana Friedlander, Tampa, for Appellee Jane Doe.
ALTENBERND, Judge.
A.S., the putative biological father of Baby A., appeals an order terminating his parental rights, which was entered in a private adoption proceeding initiated by Gift of Life Adoptions, Inc., pursuant to section 63.087, Florida Statutes (2004). He also appeals an order dismissing as moot his complaint to determine parentage under chapter 742, Florida Statutes (2004). This case involves the Florida Putative Father Registry, section 63.054, Florida Statutes (2004), and presents complicated issues affecting the legal rights of many Floridians. A.S. attempts to raise constitutional challenges to the Registry that were not preserved below. We conclude that this case can be resolved purely as a matter of statutory law. Accordingly, we decline to review the facial constitutionality of section 63.054.
The adoption statutes involved in this case are based on the theory that A.S. has no parental rights and does not need to be a party to the adoption. Gift of Life did not allege a claim for termination of parental rights against A.S., and the statutes gave the trial court no power to terminate any parental rights that A.S. might possess. Thus, even though A.S. ultimately intervened in the adoption proceeding, the trial court erred in terminating any parental rights he may have.
On the other hand, the legislature has established chapter 742 as the "primary jurisdiction" to determine paternity. See § 742.10(1), Fla. Stat. (2004). We conclude that in those relatively rare and unusual circumstances in which a putative biological father, who did not comply with section 63.054, files an action to determine parentage under chapter 742 before the conclusion of the adoption, the putative father is entitled to resolution of the chapter 742 proceeding prior to the adoption. If the chapter 742 proceeding establishes that the putative father is actually the biological father of the child and that he is assuming the responsibilities that such a determination requires, then it appears that chapter 63 gives him a role in consenting or withholding consent for an adoption of his child.
Accordingly, we conclude that the trial court erred in resolving the termination issues in the adoption proceeding before resolving the chapter 742 proceeding. The chapter 742 proceeding should not have been dismissed as moot. Thus, we reverse both orders on appeal and remand for further proceedings consistent with this opinion.

I. THE FACTS[1]
A.S. is an unmarried man in his mid-twenties. He is a high school graduate *382 and since graduating has worked for several different retail stores. At all times relevant to this case, he has lived with his parents. Jane Doe[2] is an unmarried woman of similar age who works for another retail store, earning approximately $30,000 per year.
A.S. and Jane Doe met in August 2002. They had a relationship for about a year. They lived together at the home of A.S.'s parents from May to August 2003. During this relationship, Jane Doe became pregnant. She disclosed the pregnancy to A.S. Although he was apprehensive about the prospects of being a father, he went to the first doctor's appointment with Jane Doe and tried to be supportive. Jane Doe felt, however, that A.S. was not ready to be a father. Jane Doe suffered a miscarriage. Their relationship deteriorated. Jane Doe concluded that A.S. was not going anywhere with his life and that they had different goals. As a mutual decision, she moved into her own apartment in August 2003. They did not further contact one another and were not working in nearby locations.
About a month before Jane Doe moved out, she became pregnant for a second time. She did not realize this when she moved out. Although there seems to be no question that A.S. is the father of the child,[3] Jane Doe never contacted him at work or called his house to tell him about the child. She apparently concluded that because he had been so apprehensive about the first pregnancy, there was no reason to contact him about the second one. A.S. did not discover that Jane Doe was pregnant until he was informed of the adoption proceedings.
The child was born in March 2004. About two months before the child was born, Jane Doe decided that adoption was a sensible option. The record indicates that Jane Doe first contacted Gift of Life's adoption agency on the day the child was born. She gave them detailed information about herself and her family's personal and health history. She declined to provide A.S.'s name, although she gave a full physical description of him. Gift of Life paid Jane Doe an undisclosed amount of money, and she was allowed to have some information about the prospective adoptive parents before surrendering the child to them.

II. THE TERMINATION PROCEEDING
Gift of Life began the litigation by filing a motion to authorize placement of the child with the prospective adoptive parents on April 6, 2004. The case was assigned case number 04-3998 and assigned to Judge Marion L. Fleming. On April 19, she entered a standard order sealing the file and a separate order authorizing the preliminary placement of the child with the prospective adoptive parents. This latter order specifically noted that the placement was "at risk and that the minor is subject to removal from the prospective adoptive home by Gift of Life Adoptions, Inc., or by *383 court order." Shortly thereafter, Gift of Life filed a "petition for voluntary termination of parental rights."
The petition for voluntary termination of parental rights contained the information required by section 63.087(4), Florida Statutes (2004). It alleged the birth of the child and indicated that the birth mother consented to the child's adoption through Gift of Life. Among the allegations, it provided that no grandparents were entitled to notice under section 63.0425, Florida Statutes (2004). It identified Jane Doe as the birth mother and stated that the birth father was "unknown." Although A.S. was not identified by or served with this pleading, the petition concludes with a request that the trial court enter an order terminating the "parental rights of the biological parents and placing the child in the temporary and permanent custody of Gift of Life Adoptions, Inc., for subsequent adoption."[4]
There are multiple exhibits appended to the petition, including the birth mother's consent to the adoption. One of the exhibits is a "case note summary" in which the case worker reports that the birth mother "has refused to give any information regarding the birth father and can do so under the Statute." The report, however, continues with a physical description of the father, reporting that he still "resides in the State of Florida with his parents." Thus, it is obvious from the court file that Jane Doe knew the identity and whereabouts of A.S. and his parents, with whom she had resided at the time of conception, and that she unilaterally chose not to share this information with Gift of Life. It seems equally clear that Gift of Life informed her that she had the right to withhold this information under the statute.
Although the petition designated the father of the child as "unknown" and there is no indication in the record that the petition was served on A.S., on September 7, 2004, A.S. filed a notarized handwritten letter indicating he objected to the adoption of the child. It appears this letter was also faxed to Gift of Life on September 3. A.S. indicated that he was served with a "notice of intended adoption plan" on August 25, 2004. He stated, "I am personally willing and able to take full responsibility for my [child]" and "I also am willing to contribute to any living and medical expenses incurred by [Jane Doe's] pregnancy and the birth of my [child]." On September 10, 2004, an attorney appeared on behalf of A.S. and filed a "response to intended adoption" reiterating much of what A.S. wrote in the earlier letter.
On September 23, 2004, an attorney filed a notice of appearance on behalf of the prospective adoptive parents. The prospective adoptive parents then filed a motion to intervene as necessary parties on October 27, 2004. When the trial court denied this motion by an order entered November 17, 2004, the court explained the series of events leading to the appearance of the birth father in this case.
According to the order, Judge Fleming had noted the case worker's summary filed by Gift of Life and had become concerned about the fact that Jane Doe was withholding information about the biological father. Accordingly, Judge Fleming ordered Jane Doe to appear before the court.[5] As Judge Fleming summarized the events, Jane Doe testified that the attorney for Gift of Life told her that she had a right of privacy that included her right not to identify *384 the father of the child. Judge Fleming informed Jane Doe that this advice was legally incorrect and ordered Jane Doe to identify the father so he could be notified of the proceedings. Judge Fleming's order stated: "The mother willingly complied, even giving the birth father's address."
Citing cases that hold that prospective adoptive parents have no right to intervene in a termination proceeding, see, e.g., Gift of Life, Inc. v. D.E.F. (In re D.L.G.), 802 So.2d 1152 (Fla. 2d DCA 2001); Prospective Adoptive Parents v. C.V. (In re Baby Boy G.), 703 So.2d 1103 (Fla. 2d DCA 1997), Judge Fleming denied the prospective adoptive parents' motion to intervene. Judge Fleming entered a separate order appointing a guardian ad litem for purposes of the termination proceeding.
It is undisputed that Judge Fleming ordered Gift of Life to serve A.S. with a notice of intended adoption plan pursuant to section 63.062(3)(a) and thus to inform him of the proceedings, although no written order to this effect appears in our record. Section 63.062(3)(a) states that
an adoption entity may serve upon any unmarried biological father identified by the mother or identified by a diligent search of the Florida Putative Father Registry . . . a notice of intended adoption plan at any time prior to the placement of the child in the adoptive home, including prior to the birth of the child. The notice of intended adoption plan must specifically state that if the unmarried biological father desires to contest the adoption plan, he must file with the court, within 30 days after service, a verified response that contains a pledge of commitment to the child in substantial compliance with subparagraph (2)(b)(2). The notice of intended adoption plan shall notify the unmarried biological father that he must file a claim of paternity form with the Office of Vital Statistics within 30 days after service upon him and must provide the adoption entity with a copy of the verified response filed with the court and the claim of paternity form filed with the Office of Vital Statistics. . . . If the unmarried biological father . . . fails to properly file a verified response with the court and . . . a claim of paternity form with the Office of Vital Statistics within 30 days after service upon that unmarried biological father . . ., the consent of that unmarried biological father . . . shall no longer be required under this chapter and that party shall be deemed to have waived any claim of rights to the child. Each notice of intended adoption plan served upon an unmarried biological father must include instructions as to the procedure the unmarried biological father must follow to submit a claim of paternity form to the Office of Vital Statistics and the address to which the registration must be directed.
A.S. complied with the instructions listed in the notice of intended adoption plan provided by Gift of Life.
The prospective adoptive parents moved for rehearing on their motion to intervene. Before Judge Fleming's ruling on that motion, on December 10, 2004, Gift of Life moved to disqualify her. The motion was supported by an affidavit from Cliff Davis, generally confirming the events described in Judge Fleming's order. Judge Fleming granted the motion to disqualify, and Judge Raymond O. Gross was later assigned to hear the case. Judge Gross ultimately permitted the prospective adoptive parents to intervene as "participants,"[6] not parties, to the action.
*385 III. AN ASIDE CONCERNING JUDGE FLEMING'S ORDER TO DISCLOSE THE IDENTITY OF THE BIOLOGICAL FATHER
If this case had been assigned to a different, less observant trial judge, it is worth noting that it might have taken an entirely different path. Presumably, the trial court would have entered an order terminating the parental rights of Jane Doe and also the rights of the unidentified, unserved biological father. At some point, the child would have been adopted by the prospective adoptive parents. There is a good chance that A.S. and the child's paternal grandparents would never have known of the child's existence.
Although this court has little evidence before it on the subject, it appears likely that, after the effective date of the Florida Putative Father Registry, a significant number of cases may have proceeded along this path without any notification to the putative biological father or other paternal relatives. There is at least one additional case pending in this court involving an adoption agency that requested and received a "termination" of parental rights for a man who was not named or served in the action. The parties concede that only a very small percentage of affected putative biological fathers have actually registered under the act.[7] Many of the affected putative biological fathers may be young, irresponsible, and totally unprepared to care for a child. In at least a few cases, it is possible that the biological father is actually better prepared financially and emotionally to care for the child than the prospective adoptive parents. These circumstances present larger social issues that invite resolution, but this case is not a proper vehicle to resolve these issues.
Because Judge Fleming's decision has altered the course of this case, it is worth emphasizing that her ruling has support within the applicable statutes and was not challenged in this court by writ of certiorari or prohibition. Proceedings to terminate parental rights pending adoption are explained in section 63.088, Florida Statutes (2004). Subsection 4 of that statute is entitled "REQUIRED INQUIRY" and tells the trial court that it "must" conduct an inquiry regarding the identity of "any man with whom the mother was cohabiting at any time when conception of the minor may have occurred." § 63.088(4)(d). Thus, it would appear that Judge Fleming not only had discretion to inquire of Jane Doe about A.S., she may have had a statutory obligation to make this inquiry.
Under section 63.062(3)(a), an adoption agency has the discretion, but not a duty, to notify an unmarried biological father like A.S. of the intended adoption, even if he cohabitated with the mother at the time of conception. It is unclear what factors, if any, the agency is supposed to consider in making this decision.[8] In this case, *386 Judge Fleming essentially ordered the adoption agency to provide the notification required by that statute. Although the issue is not squarely before us, we are inclined to believe that, being obligated to make the inquiry, Judge Fleming had the discretion to order this disclosure.
Nevertheless, as we will discuss later, because A.S. is not a person required to consent to the adoption under the current statutory framework, it is not entirely clear what role he could play in the termination proceeding once he was notified because the notification occurred after the petition had been filed. His decision to file the action to determine parentage that is described in the next section was probably the result of the unusual position in which he was placed in the termination proceeding.

IV. THE DETERMINATION OF PARENTAGE PROCEEDING UNDER CHAPTER 742
In addition to responding to the notice of intended adoption plan and to the pleadings in the termination proceedings, on September 29, 2004, A.S. filed a "petition to establish paternity" in Pinellas County pursuant to chapter 742. In this action, A.S. brought suit only against Jane Doe. He filed a typical complaint to determine parentage requesting that he share parental responsibility for the child, that he be designated the primary residential parent of the child, and that Jane Doe pay child support. A.S. disclosed the existence of the pending termination proceeding in his petition. Gift of Life was not a party to this lawsuit, but it is not obvious under the provisions of chapter 742 that it was a necessary party. The prospective adoptive parents were also not parties, but it is doubtful that A.S. could have determined their identity at the time he filed this action.
As a matter of course, A.S. was ordered to attend a parent education course in the paternity action, and he immediately complied with that order. In January 2005, Jane Doe, represented by counsel, filed a "response" to the petition in which she admitted that A.S. was the father of the child. She explained that the child had been placed for adoption and that the child was in the custody of the prospective adoptive parents.
In February 2005, A.S. moved for summary judgment because Jane Doe had admitted he was the child's father. This pleading was filed with a style containing both the case number for the chapter 742 proceeding as well as the case number for the chapter 63 proceeding, as if the two cases had been consolidated. No further activity occurred in the parentage proceeding until Judge Gross entered an order dismissing it on June 17, 2005, as "moot" because of his rulings in the termination proceeding.
The inaction in the parentage proceeding is explained by documents in the termination proceeding. Pinellas County has a unified family court division, and both of these cases, though not consolidated, were assigned to Judge Gross. Jane Doe filed a "motion to abate" the parentage proceeding in the termination proceeding. Like A.S.'s motion for summary judgment, the style listed both case numbers, but it was filed only in the parentage proceeding. On May 9, the trial court held a simultaneous hearing in both cases. Over A.S.'s objection, Judge Gross granted a motion to stay the parentage proceeding. The order was entered and filed only in the termination proceeding. It is apparent, however, that the trial court did not actually stay either proceeding. It simply treated them as if they were one action and decided to resolve the termination issues before deciding the paternity issues. As we will ultimately *387 conclude, this decision is the point at which the trial court ventured down the wrong path.

V. RETURNING TO THE TERMINATION PROCEEDING
After the termination proceeding was assigned to Judge Gross, A.S. filed both an answer and a motion to dismiss in January 2005. These documents are interesting because the petition for voluntary termination of parental rights does not name A.S. and does not contain any allegations concerning him except for the fact that the father, whoever he might be, is "unknown." A.S.'s motion to dismiss alleges that Gift of Life failed to allege any act committed by A.S. that would permit the termination of his parental rights under either chapter 39 or 63, Florida Statutes (2004). There is no order expressly disposing of this motion to dismiss.
A.S. did not file a pleading expressly challenging the constitutionality of any statute either facially or as applied. Rather, A.S. simply admitted that he was the father of the child and denied that he had abandoned the child.
The prospective adoptive parents sought rehearing of their motion to intervene based upon the recusal of Judge Fleming. Judge Gross reheard the matter and entered an order on February 14 permitting the prospective adoptive parents to intervene as "participants," entitled to notice but not to be heard. They were authorized to proceed anonymously.[9]
Gift of Life filed a very short motion for summary judgment, arguing that the trial court should enter a final judgment terminating A.S.'s parental rights because he did not comply with the statutes creating the Florida Putative Father Registry. See §§ 63.054, .062(2). The motion attached a copy of an order granting comparable relief in an unrelated Thirteenth Judicial Circuit proceeding. In essence, the motion argued that because A.S. did not file a claim prior to the birth of the child, any parental rights he might otherwise have had must be terminated. In other words, Gift of Life asked the trial court to "terminate" rights that it maintained A.S. had never hadat least from the moment the mother filed the consent for adoption.
A.S. filed a document entitled "motion in opposition to termination of parental rights," apparently as a response to the motion for summary judgment. A.S. argued that the Florida Putative Father Registry is new, that the State's brochure publicizing this program was not published until after his child was born, and that he was unaware of this law at all times in which he could have complied. He argued that Jane Doe knowingly and intentionally hid her pregnancy from him and that he would have filed his petition to determine parentage earlier if she had notified him that she was pregnant.[10] He emphasized *388 that there was no allegation or proof that he was unfit to serve as the child's custodial parent. Again, A.S. did not directly challenge the constitutionality of any aspect of this statutory proceeding. In fact, he did not challenge the constitutionality of the Florida Putative Father Registry provisions, even though the trial court had raised the possibility of the issue at a hearing held approximately a month earlier and inquired whether A.S. intended to make such a challenge.
Gift of Life filed an extensive memorandum with the court in support of its motion for summary judgment. It contained what appeared to be "canned" arguments, including an argument that the Florida Putative Father Registry statutes are constitutional under a due process and equal protection analysis. Thus, this case is in the odd posture of having no constitutional challenge made by A.S. in the trial court but having a defense against such a constitutional argument filed by Gift of Life.[11]
Judge Gross conducted a hearing on Gift of Life's motion for summary judgment on June 10, 2005. At the beginning of the argument, he noted that there were two separate case numbers. He explained that the cases had not been consolidated but that the second case was being "considered" with the first. The arguments made by counsel at this hearing were wide-ranging but did not include any constitutional arguments by A.S. The only sworn testimony before the court was in the form of depositions of A.S. and Jane Doe. In a nutshell, Gift of Life argued that because it was undisputed that A.S. had not filed a claim with the Florida Putative Father Registry prior to the birth of his child and the mother's consent to the adoption, the adoption statute required a termination of his parental rights.
On June 16, 2005, Judge Gross entered an order granting summary judgment.[12] As stated in his conclusion, he ruled: "Because it is undisputed by the parties that the putative biological father failed to timely register with the Florida Putative Father Registry pursuant to the provisions of chapter 63, Florida Statutes (2004), his *389 consent to termination of parental rights and adoption is not required. See § 63.062(2)(d), Fla. Stat. (2004)." Even though A.S. had not articulated a constitutional challenge to the statute, the court addressed the issue in the order but concluded that pursuant to Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), there was "no constitutional infirmity" that would prevent applying the statutes as written to A.S. As described earlier, Judge Gross entered an order the following day dismissing the determination of parentage action. Thus, we review both orders in this appeal.
VI. THERE IS NO STATUTORY AUTHORITY TO TERMINATE THE PARENTAL RIGHTS OF A.S. IF HE IS NOT A STATUTORY "PARENT"
The trial court was partially correct in its summary judgment. Under the applicable statutes, A.S.'s consent to the adoption is not required unless he can establish that he is a "parent"something he had not done at the time the summary judgment was entered. However, if an unmarried biological father is not a "parent" as defined in the statutes, there is no statutory provision for terminating that father's rights. Instead, the statutes are premised on a legal theory that an unmarried biological father who is not a "parent" has no "parental rights" to terminate and does not need to be a party to the lawsuit.
The parties in this case have extensively briefed and argued constitutional issues that were not litigated in the trial court. Not only are these issues poorly preserved or unpreserved, but this court is obligated to resolve cases without reaching these types of constitutional questions whenever possible. See McKibben v. Mallory, 293 So.2d 48, 51 (Fla.1974) ("It is a fundamental principle that courts will not pass upon the constitutionality of a statute where the case before them may be disposed of upon any other ground."); see also Matthews v. Weinberg, 645 So.2d 487, 488 (Fla. 2d DCA 1994). We conclude that the resolution of this case lies in the proper interpretation of the applicable statutes, not in addressing the admittedly significant constitutional issues raised by the current adoption statutes.
Chapter 63 was extensively amended in 2003. See ch. 2003-58, § 2, Laws of Fla. (eff. May 30, 2003).[13] There is little case law explaining or interpreting this statute since the 2003 amendments were enacted. See, e.g., A.F.L., Jr. v. Dep't of Children & Families, 927 So.2d 101 (Fla. 5th DCA 2006); J.S. v. S.A., 912 So.2d 650 (Fla. 4th DCA 2005); S.K.R. v. Dep't of Children & Family Servs., 902 So.2d 328 (Fla. 2d DCA 2005). Following a careful examination of the present statutory provisions, we conclude that Gift of Life never alleged a cause of action to terminate the parental rights of A.S. and that it had no statutory basis to do so. Accordingly, the trial court erred when it terminated the parental rights of A.S. without any legal power to take that action.
The current adoption statutes establish a two-step process for adoption in which a termination of parental rights occurs first and is followed by an adoption. In the *390 2003 revisions to the adoption statutes, the legislature specifically created the Florida Putative Father Registry. The legislature expressly announced its intent and the policies underlying that intent as follows:
(1) The Legislature finds that:
(a) The state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children.
(b) An unmarried mother faced with the responsibility of making crucial decisions about the future of a newborn child is entitled to privacy, has the right to make timely and appropriate decisions regarding her future and the future of the child, and is entitled to assurance regarding an adoptive placement.
(c) Adoptive children have the right to permanence and stability in adoptive placements.
(d) Adoptive parents have a constitutional privacy interest in retaining custody of a legally adopted child.
(e) An unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during the pregnancy and after the child's birth. The state has a compelling interest in requiring an unmarried biological father to demonstrate that commitment by providing appropriate medical care and financial support and by establishing legal paternity rights in accordance with the requirements of this chapter.
(2) It is the intent of the Legislature that in every adoption, the best interest of the child should govern and be of foremost concern in the court's determination. The court shall make a specific finding as to the best interest of the child in accordance with the provisions of this chapter.
(3) It is the intent of the Legislature to protect and promote the well-being of persons being adopted and their birth and adoptive parents and to provide to all children who can benefit by it a permanent family life, and, whenever appropriate, to maintain sibling groups.
(4) The basic safeguards intended to be provided by this chapter are that:
(a) The minor is legally free for adoption and that all adoptions are handled in accordance with the requirements of law.
(b) The required persons consent to the adoption or the parent-child relationship is terminated by judgment of the court.
§ 63.022, Fla. Stat. (2004).
The legislature's theory that an unmarried biological father's constitutional rights are "inchoate" is further explained in section 63.053. That statute explains:
(1) In enacting the provisions contained in this chapter, the Legislature prescribes the conditions for determining whether an unmarried biological father's actions are sufficiently prompt and substantial so as to require protection of a constitutional right. If an unmarried biological father fails to take the actions that are available to him to establish a relationship with his child, his parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the available legal steps to substantiate a parental interest.
(2) The Legislature finds that the interests of the state, the mother, the child, and the adoptive parents described in this chapter outweigh the interest of an unmarried biological father who does not take action in a timely *391 manner to establish and demonstrate a relationship with his child in accordance with the requirements of this chapter. An unmarried biological father has the primary responsibility to protect his rights and is presumed to know that his child may be adopted without his consent unless he complies with the provisions of this chapter and demonstrates a prompt and full commitment to his parental responsibilities.
(3) The Legislature finds that a birth mother and a birth father have a right to privacy.
The legislature's intent is implemented in part by defining who is a "parent." Chapter 63 has no definition of "mother" or "father." Rather, section 63.032(12) states that the word "parent" as used in chapter 63 "has the same meaning ascribed in s. 39.01." Section 39.01(49), Florida Statutes (2004), defines parent as follows:
"Parent" means a woman who gives birth to a child and a man whose consent to the adoption of the child would be required under s. 63.062(1). . . . The term does not include an individual whose parental relationship to the child has been legally terminated, or an alleged or prospective parent, unless the parental status falls within the terms of s. 39.503(1) or s. 63.062(1).
Thus, A.S. is a "parent" for purposes of chapter 63 if he is "a man whose consent to the adoption of the child would be required under [section] 63.062(1)." Section 63.062 addresses the persons required to consent to adoption. In subsection (1), the legislature explains that a "petition to terminate parental rights pending adoption may be granted only if" written consent has been obtained from, or notice provided to, five different categories of people. The "father" is essential to such a termination only if:
1. The minor was conceived or born while the father was married to the mother;
2. The minor is his child by adoption;
3. The minor has been established by court proceeding to be his child;
4. He has filed an affidavit of paternity pursuant to s. 382.013(2)(c); or
5. In the case of an unmarried biological father, he has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor, has filed such acknowledgment with the Office of Vital Statistics of the Department of Health within the required timeframes, and has complied with the requirements of subsection (2).
§ 63.062(1)(b)(1)-(5).
A.S. does not fit into the circumstances described in subsections 1, 2, or 4. He has attempted to establish his rights under subsection 3, but that proceeding was stayed in favor of the termination. He has also argued that he has established rights under subsection 5. Thus the dispute in the termination case centers upon whether A.S. has established the right to consent or object to the adoption or should have been provided the opportunity to do so in the paternity action. If he has not established the right to consent or object to the adoption, the statutes treat him as a stranger to the litigation, with no rights to be terminated. Based upon this analysis, the trial court could not determine that A.S. had failed to establish his status as a "parent" but then terminate his "parental rights." To the extent the trial court did so, it erred.

VII. A.S. IS NOT A "PARENT" PURSUANT TO SECTION 63.062(1)(b)(5)
As stated above, A.S. would be considered a parent, whose consent was required for an adoption, if he "acknowledged *392 in writing, signed in the presence of a competent witness, that he is the father of the minor, has filed such acknowledgment with the Office of Vital Statistics of the Department of Health within the required timeframes, and has complied with the requirements of subsection (2)." § 63.062(1)(b)(5). We agree with the trial court that A.S. has not met the requirements of subsection 5 because he failed to, "within the required timeframes," comply with the "requirements of subsection (2)."
Section 63.062(2)(b) provides that the consent of an unmarried biological father is necessary when a child is younger than six months of age at the time the child is placed with prospective adoptive parents only if the father has
demonstrated a full commitment to his parental responsibility by having performed all of the following acts prior to the time the mother executes her consent for adoption:
1. Filed a notarized claim of paternity form with the Florida Putative Father Registry within the Office of Vital Statistics of the Department of Health, which form shall be maintained in the confidential registry established for that purpose and shall be considered filed when the notice is entered in the registry of notices from unmarried biological fathers.
2. Upon service of a notice of an intended adoption plan or a petition for termination of parental rights pending adoption, executed and filed an affidavit in that proceeding stating that he is personally fully able and willing to take responsibility for the child, setting forth his plans for care of the child, and agreeing to a court order of child support and a contribution to the payment of living and medical expenses incurred for the mother's pregnancy and the child's birth in accordance with his ability to pay.
3. If he had knowledge of the pregnancy, paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability and when not prevented from doing so by the birth mother or person or authorized agency having lawful custody of the child.
Here, A.S. did attempt to file the notarized claim of paternity with the Florida Putative Father Registry. It is undisputed, however, that the claim was untimely because it was filed after the mother had executed her consent to the adoption and after Gift of Life filed its petition for termination of parental rights pending adoption. See § 63.062(b)(1); see also § 63.054(1) ("The claim of paternity may be filed [with the Florida Putative Father Registry] at any time prior to the child's birth, but a claim of paternity may not be filed after the date a petition is filed for termination of parental rights.").
As section 63.062(2)(d), states:
An unmarried biological father who does not comply with each of the conditions provided in this subsection is deemed to have waived and surrendered any rights in relation to the child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption of the child is not required.
Thus, under the clear and unambiguous language of these statutes, A.S. is not a man required to consent to the adoption and, thus, he is not a statutory "parent," even though he presumably is the child's biological father. It is not this court's job today to determine the wisdom of this statutory structure, but simply to apply it.
A.S. has argued that he is a parent whose consent is required under section 63.062(2)(b) because Gift of Life, compelled to do so by Judge Fleming, served A.S. *393 with a notice of intended adoption plan pursuant to section 63.062(3)(a), and he complied with the procedures required by that notice.[14] However, section 63.062(2)(b) required A.S. to timely comply with the requirements listed in the notice of intended adoption plan, see § 63.062(2)(b)(2), and to timely file his claim with the Florida Putative Father Registry, see § 63.062(2)(b)(1).
We admit that section 63.062(3)(a) seems odd to this court. It appears to give discretion to the adoption entity as to whether to notify a man such as A.S. of an intended adoption prior to the placement of the child in the adoptive home. It then notifies the putative father that he must file a claim with the Florida Putative Father Registry. However, if the claim is filed after the mother has executed the consent to adoption or after the petition for termination of parental rights is filed, it appears that the father may still be deemed to have waived or surrendered his rights to the child because he will not have timely complied with section 63.062(2)(b)(1). In this case, the matter is even more confusing because Gift of Life had already placed the child, obtained the mother's consent, and filed its petition for termination of parental rights before Judge Fleming compelled it to disclose the adoption to A.S.
It is not entirely clear what rights A.S. or a similarly situated unmarried biological father may have in a termination of parental rights pending adoption proceeding if he receives notice of the proceeding and appears. Nevertheless, the statutes do not give such a father a role in consenting or objecting to the adoption, nor do they permit a termination of any rights, inchoate or otherwise, that the father may have.
The legislature's intent to treat an unmarried biological father such as A.S. as a "non-parent" who has no established rights requiring termination is further demonstrated in sections 63.088 and 63.089. These statutes describe the proceedings to terminate parental rights pending adoption, including provisions regarding who should receive notice and the grounds for terminating parental rights under the statute. Both statutes refer specifically to providing notice of the adoption to, and to holding hearings for, only those persons "whose consent to adoption is required." Notice to an unregistered putative biological father, such as A.S., is not required because he is not a person whose consent is required. There are numerous grounds for termination in section 63.089(3), but these refer only to "each person whose consent to adoption is required."[15]
Thus, Gift of Life properly followed the statute when it neither named nor served A.S. and placed no allegations concerning A.S. in its complaint. At the time the complaint was filed, A.S. was not a "parent" or a person whose consent was required *394 because he did not meet the requirements of section 63.062(1)(b)(1)-(5).[16] Concomitantly, if A.S. was not a parent, there was no authority for the trial court to terminate his parental rights.[17]
Nevertheless, while this proceeding was pending, A.S. sought to establish his rights not only by filing his untimely claim with the Florida Putative Father Registry but also by filing an action to determine parentage under chapter 742. If A.S. were able to establish paternity under chapter 742, he would become a "parent" whose consent to adoption is required pursuant to section 63.062(1)(b)(3). Because chapter 742 "provides the primary jurisdiction and procedures for the determination of paternity for children born out of wedlock," § 742.10(1), and because there is no time limit for filing such a proceedingat least in the absence of a final judgment of adoption otherwise establishing the parentage of a child with the prospective adoptive parentswe conclude that A.S. was entitled to pursue his action for paternity and that the adoption proceeding could not be resolved by summary judgment until it was determined whether A.S. was a parent through the paternity proceeding.
VIII. THE TRIAL COURT WAS REQUIRED TO DETERMINE PARENTAGE PURSUANT TO CHAPTER 742 UNDER THESE UNUSUAL CIRCUMSTANCES
The legislature has determined that chapter 742 should be the "primary *395 jurisdiction" to determine paternity. See § 742.10(1). Although a trial court cannot terminate unrecognized parental rights in a chapter 63 proceeding, an unmarried biological father may still be able to transform the "inchoate interest" recognized by the legislature in section 63.022(1)(e) into an established parental right in a chapter 742 proceeding, thus requiring, pursuant to section 63.062(1)(b)(3), his consent and the termination of those parental rights in any proceeding to adopt the child.[18]
We can find no provision in chapter 742 that bars an unmarried biological father from filing a complaint to determine parentage merely because he has failed to register with the Florida Putative Father Registry.[19] Section 742.07 explains that an adoption by another party causes the father's support obligation to terminate. Presumably, a final judgment of adoption would also establish the child's parentage in the adoptive parents and make a determination of parentage unnecessary. But the provisions of chapter 742 do not prohibit a father with inchoate rights from filing a proceeding to establish by court order his paternal rights, even if a birth mother has executed a consent for adoption or an adoption proceeding is pending.
Despite the language of chapter 63, it seems clear to us that men such as A.S. are noncustodial parents from whom support can be demanded under Florida law.[20]See, e.g., §§ 409.2563, 742.031, Fla. Stat. (2004); see also State v. Bollinger, 88 Fla. 123, 126, 101 So. 282, 283 (Fla.1924) ("The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public policy, for the good of society, will not permit or allow the father to irrevocably divest himself of or to abandon them at his mere will or pleasure."). In this case, despite the language of chapter 63, A.S. has a legal obligation to support his child unless and until that child is adopted. If welfare payments were made to the mother, then the State may be subrogated to her rights against A.S. See § 409.2561, Fla. Stat. (2004). As noted above, he would also be entitled to notice and to participate in any proceedings brought by the State of Florida to declare this child dependent or to terminate any rights he may have to the child. See §§ 39.503(3), .801(3)(a)(6).[21]
*396 If the trial court in this case had not delayed the ruling in the chapter 742 case until after it had entered an order terminating A.S.'s parental rights, the analysis in the termination and adoption proceeding would have been different. Section 63.062(1)(b)(3) provides that a petition to terminate parental rights may be granted only after written consent or notice to a "father" under circumstances where "[t]he minor has been established by court proceeding to be his child." Thus, although A.S. is not a "parent" at this time, if he obtains a judgment in the chapter 742 proceeding, then he will be a person from whom consent is required before the trial court can enter an order of termination. Because A.S. filed the paternity proceeding before the adoption was concluded, he must be offered the opportunity to pursue his rights in that proceeding. Summary judgment was not appropriate in the termination and adoption proceeding until the paternity proceeding was decided.

IX. CONCLUSION
Our holding today resolves this case on its particular facts and provides precedent for perhaps a handful of unmarried biological fathers who have not filed a claim in the Florida Putative Father Registry but who become aware of an adoption proceeding after it has been filed and before it is concluded. The question addressed in this case does not permit resolution of some of the broader issues presented by the current adoption statutes. It does not ensure that unmarried biological fathers who might have rights independent of or in addition to the rights recognized by the legislature in chapter 63 are notified of intended adoptions. It does not ensure that adoptive parents who accept placement of a child in their home will not face challenges to the adoption from unmarried biological fathers who did not receive notice of the adoption. For now, those issues must await action by the legislature or future judicial precedent or must perhaps depend upon the integrity and vigilance of adoption agencies to take actions independent of legal requirements (and perhaps adverse to their own interests) to balance the competing interests of biological parents, adoptive parents, and the child in the adoptions they undertake.
We are also aware that, while our ruling may not affect many cases because few men like A.S. will choose to take the steps that he has taken, it will affect this child, the prospective adoptive parents, and the biological parents. Given the facts of this case and the unresolved constitutional and statutory issues, it is entirely possible that this litigation could continue for years. This case may be a perfect test case to resolve issues that might otherwise remain unresolved for future adoption cases. Yet to pursue it solely for that purpose places this child at risk of becoming the legal community's equivalent to the "Boy in the Bubble," who was confined inside a plastic bubble for twelve years while the medical community searched in vain for a cure to his condition.
The legislature has stated: "It is the intent of the Legislature that in every adoption, the best interest of the child should govern and be of foremost concern in the court's determination." § 63.022(2). We share this intent, and each participant *397 to this proceeding has expressed the same intent. Certainly, finality and stability are in the best interest of this child. Given that our society now reflects a diverse spectrum of family structures in which children enjoy multiple parents and surrogate parents, all of whom attempt to fulfill the best interests of the child, perhaps the participants in this case can find a final resolution that the legal system is unable to provide.
Reversed and remanded for further proceedings consistent with this opinion.
DAVIS, J., and BERGMANN, CHARLES ED, Associate Judge, Concur.
NOTES
[1] These facts are drawn from pleadings and depositions that appear in our record. Because the material facts were undisputed, no evidentiary hearing or trial was held. We note that the adoption proceeding involves a sealed court file that cannot be viewed by the public. The policy behind sealing such records is to ensure that the privacy of the individuals involved in the proceeding is not unduly invaded. Interestingly, the privacy of the litigants is not generally protected in paternity proceedings such as the one filed by A.S. This case presents serious legal and social issues related to recent substantial amendments to Florida's adoption law. Given the importance of this case, it is necessary to describe aspects of the litigation in greater detail to help the public understand the proceedings. Many of the pleadings are unusual or unique. Some are candidly a little confusing. We have attempted to delicately balance the interests involved by disclosing those facts necessary to present a complete picture of the case without exposing details that might identify the litigants or the child.
[2] Normally, we would refer to the mother by her initials. Given our decision to describe the facts in some detail, as explained in footnote one, we conclude that it is more appropriate to refer to her as "Jane Doe."
[3] All parties agree that he is the biological father, but no one has performed any DNA testing to confirm this fact.
[4] The petition was signed by "Cliff Davis, Director." His signature was notarized, but it is unclear from the language used whether the complaint was actually made under oath.
[5] The order to appear may have been oral. No such written order exists in this record.
[6] This term perhaps refers to Florida Rule of Juvenile Procedure 8.210. It is not clear whether adoption proceedings under chapter 63 are governed by this rule of juvenile procedure. Compare Fla. R. Juv. P. 8.000 (stating the juvenile rules "shall govern the procedures in the juvenile division of the circuit court"), with Fla. Fam. L.R.P. 12.010 (stating the family law rules apply to "all actions concerning family law matters" which "include, but are not limited to . . . adoption").
[7] Pursuant to the Florida Department of Health Statistics, approximately three out of every five births in 2004 involved an unmarried mother. A study of Florida's children revealed 84,733 children were born to unmarried mothers in 2003. See S. Weitzel & C. Shockley, Florida's Children at a Glance: 2005 (University of South Florida, Center for the Study of Children's Futures 2005).
[8] Certainly providing the notice may help protect the agency, its clients, and the child placed for adoption from a later challenge to the adoption, and thus a prudent agency might choose to provide the notice.
[9] No one challenges this Solomonic ruling on appeal. In this appeal, the prospective adoptive parents filed a "notice of intention to join proceedings as appellees" and a brief. No other party objected to the notice or brief or moved to strike the same. The parties also permitted the attorney for the prospective adoptive parents to present a brief oral argument. This court's decision to allow these procedures in the absence of any objection should not be interpreted as a legal ruling on the subject that would create precedent for future cases.
[10] A.S. acknowledged, however, that section 63.063, Florida Statutes (2004), provides in pertinent part:

(1) Each parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or a third party, except as provided in s. 63.062(2)(a).
(2) Any person injured by a fraudulent representation or action in connection with an adoption is entitled to pursue civil or criminal penalties as provided by law. A fraudulent representation is not a defense to compliance with the requirements of this chapter and is not a basis for dismissing a petition for termination of parental rights or a petition for adoption, for vacating an adoption decree, or for granting custody to the offended party. . . .
(3) The Legislature finds no way to remove all risk of fraud or misrepresentation in adoption proceedings and has provided a method for absolute protection of an unmarried biological father's rights by compliance with the provisions of this chapter. In balancing the rights and interests of the state and of all parties affected by fraud, including the child, the adoptive parents, and the unmarried biological father, the Legislature has determined that the unmarried biological father is in the best position to prevent or ameliorate the effects of fraud and, therefore, has the burden of preventing fraud.
[11] It appears A.S. had limited financial resources to devote to this litigation. Thus, while we are somewhat critical of the failure of A.S.'s lawyers to develop the issues in this case before the trial court, they have struggled with a very new and complicated statute without the support of any interest group that might wish to make this a test case. The appellate lawyers for A.S., who have now raised some of these issues in this appeal, are not the lawyers who handled the case in the trial court.
[12] Although the order has many of the characteristics of a nonfinal order merely granting a motion, the final sentence contains language of finality terminating A.S.'s parental rights to the child. Accordingly, we have treated it as a final order.
[13] The current adoption statutes are the culmination of two major revisions undertaken by the legislature in 2001 and 2003. See ch. 2003-58, § 2, Laws of Fla. (eff. May 30, 2003); ch. 2001-3, § 7, Laws of Fla. (eff. Oct. 1, 2001); see also Jeffrey A. Parness, Adoption Notices To Genetic Fathers: No To Scarlet Letters, Yes To Good-Faith Cooperation, 36 Cumb. L.Rev. 63, 71-76 (2005-2006); Andrew T. Binstock, Not If, But When?: Dismantling The Florida Adoption Act Of 2001, 10 Cardozo Women's L.J. 625 (Summer 2004).
[14] Section 63.062(3)(a) provides, in pertinent part:

The notice of intended adoption plan must specifically state that if the unmarried biological father desires to contest the adoption plan, he must file with the court, within 30 days after service, a verified response that contains a pledge of commitment to the child in substantial compliance with subparagraph (2)(b)(2). The notice of intended adoption plan shall notify the unmarried biological father that he must file a claim of paternity form with the Office of Vital Statistics within 30 days after service upon him and must provide the adoption entity with a copy of the verified response filed with the court and the claim of paternity form filed with the Office of Vital Statistics.
[15] This statute also permits termination based upon a theory of parental "abandonment." See § 63.089(4). It appears the statute would apply this concept only to a person who met the definition of a parent. Further, abandonment under the statute implies a willful and knowing rejection of parental obligations and thus would not appear to apply to a man such as A.S. who did not know of the pregnancy or the child's existence. See § 63.032(1) (defining abandonment in pertinent part as "a situation in which the parent or person having legal custody of a child, while being able, makes no provision for the child's support and makes little or no effort to communicate with the child").
[16] We note that in chapter 39 proceedings, A.S. would also not be considered a parent under section 39.01(49), but he would be a "prospective parent" pursuant to section 39.01(56) (defining prospective parent as "a person who claims to be, or has been identified as, a person who may be a mother or a father of a child"). As a "prospective parent" in a chapter 39 proceeding, A.S. would be entitled to notice of any hearing on dependency or termination of his "parental rights." See §§ 39.503(3), .801(3)(a)(6), Fla. Stat. (2004). Under Florida Rule of Juvenile Procedure 8.210, he would be classified as a "participant" in that proceeding. The concept of a "prospective parent" does not appear in chapter 63 except as it relates to prospective adoptive parents.
[17] Notwithstanding the legislature's intent to treat unmarried biological fathers such as A.S. as "non-parents" who have no "parental rights" to be terminated, intuitively, lawyers and judges who work in the field of adoption have assumed that such men did have some modicum of parental rights, particularly given statutory provisions imposing duties of support on them. There clearly is a concern that the assumptions made by the legislature in the revisions to chapter 63 may not align with the constitutional liberty interests that have been or might hereafter be announced by either the Supreme Court of Florida or the United States Supreme Court. See, e.g., Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1982) (addressing an unmarried father's rights to a child in the context of the father's relationship to the child; stating that "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring," and framing the issue on appeal as "whether New York has adequately protected [the unmarried father's] opportunity to form such a relationship"). To protect all involved in the intensely personal and emotional adoption process, the professionals who work in this field have attempted to create mechanisms within chapter 63 to terminate any possible parental rights of undisclosed, unmarried, and perhaps unknown biological fathers. We understand these concerns. As drafted, however, chapter 63 does not provide a statutory mechanism to terminate any rights that may be possessed by potential parents; it only seeks to define individuals as parents whose rights can be terminated or non-parents who have no statutory rights.
[18] Indeed, the fact that the trial court can do this in the rare case where a biological father chooses to aggressively pursue his rights may provide the protection of the father's "opportunity" to establish his parental relationship and thus make the provisions of chapter 63 less susceptible to as-applied constitutional attacks.
[19] Gift of Life argues that section 63.054(1) bars such an action. That statute addresses the filing of "a notarized claim of paternity form with the Florida Putative Father Registry maintained by the Office of Vital Statistics of the Department of Health." It does not affect the right to file an action under chapter 742.
[20] Gift of Life argues that no unmarried biological father in Florida has any rights to his biological child unless he timely registered with the Florida Putative Father Registry. It argues that, as a matter of law, such a father's "inchoate" rights cease no later than the moment when the chapter 63 petition is filed, even though he is not named in the petition or served with a copy. Rights and responsibilities tend to flow hand-in-hand. If correct, Gift of Life's argument would potentially jeopardize the rights of thousands of children who have not been adopted to receive child support from their unregistered, unmarried biological fathers.
[21] This case demonstrates that Florida has taken substantially different statutory approaches to the rights and responsibilities of biological fathers of children born to unmarried mothers depending upon the issue at stake. In cases of adoption, we wish to minimize unmarried biological fathers' rights. When the state seeks to declare a child dependent, the unmarried biological father's rights are guarded in the hopes the father will fulfill his parental obligations to the child. In cases of child support, especially when the state seeks reimbursement of welfare payments, we attempt to maximize the unmarried biological father's responsibilities. Whether Florida needs a unified policy for the rights of such biological fathers or whether varying policies can coexist is an interesting issue that is raised, but certainly not resolved, in this case.